

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-07-00231-CV

ROBERT GENE CUNNINGHAM, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF PATRICIA MAUDINE CUNNINGHAM, DECEASED, ROBIN LEE CUNNINGHAM BISHOP, AND TRACY JEANNE CUNNINGHAM LANG

APPELLANTS

V.

LADI O.M. HAROONA, M.D.

APPELLEE

----------

FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

## I. Introduction

Patricia Maudine Cunningham (Pat) was hospitalized at Plaza Medical Center on May 24, 2003, for treatment of severe jaw pain. While in the hospital,

Pat developed bilateral pneumonia and a progressive cascade of other conditions, including hypoxia, respiratory failure, sepsis, disseminated intravascular coagulation (DIC), strokes, and multi-organ failure and died two weeks later on June 7, 2003. Her surviving spouse, Robert Gene Cunningham (Bob), brought this medical malpractice suit individually and as representative of Pat's estate on August 29, 2003,[1] seeking wrongful death and survival damages against seven defendants: Plaza Medical Center of Fort Worth; Janet Koch, R.N.; Krishnababu Chunduri, M.D.; Lincoln Chin, M.D.; Noble Ezukanma, M.D.; Ladi O.M. Haroona, M.D.; and HealthFirst Medical Group, P.A.

Beginning on October 30, 2006, trial to a jury spanned almost three months.[2] The jury returned its verdict on January 22, 2007, finding "yes" in answer to a broad-form submission that negligence of Plaza Medical Center, Dr. Chunduri, and Dr. Ezukanma proximately caused Pat's death. The jury found "no" as to any negligence of Dr. Haroona, Dr. Chin, Health First Medical Group, P.A., or Nurse Koch that proximately caused Pat's death. The jury awarded Bob wrongful death damages of $250,000 for loss of society and companionship and $250,000 in mental anguish, and it awarded the daughters $10,000 each for mental anguish. The jury also awarded survival damages of $1.43 million for

---

[1]Bob and Pat's daughters are also named as plaintiffs. We refer to Bob and Bob and Pat's daughters collectively as the Cunninghams.

[2]The reporter's record consists of fifty-two volumes, totaling almost 10,000 pages, with a clerk's record of over 6,000 pages.

pain and mental anguish suffered by Pat as the result of her "injuries in question" before her death and $71,140.42 for medical expenses for treatment of her injuries.[3]

The trial court signed the final judgment on the verdict on April 13, 2007, for damages against Dr. Chunduri, Dr. Ezukanma, HealthFirst Medical Group, P.A., and Plaza Medical Center. Defendants Dr. Chunduri, Dr. Ezukanma, and HealthFirst Medical Group, P.A. appealed from the judgment against them.[4] Dr. Ezukanma and HealthFirst Medical Group, P.A. settled with the Cunninghams during the pendency of this appeal but before submission of the appeal in this court. Dr. Chunduri settled with the Cunninghams after submission. This opinion addresses the only remaining part of this case, the Cunninghams' appeal from the take-nothing judgment as to Dr. Haroona.

## II. Issue Presented

In their sole issue, the Cunninghams complain that the trial court erred by refusing to submit their requested separate liability questions (one for Pat's wrongful death and the other for her survival action), by instead combining their wrongful death and survival actions into one liability question for negligence that

---

[3]The jury awarded "0" survival damages for injuries to Pat for disfigurement or physical impairment. We will assume in the remainder of this opinion that, in addition to pain and mental anguish, those alleged damages are included in the survival damages now sought against Dr. Haroona.

[4]The judgment includes recitations of joint and several liability among and between Dr. Chunduri, Dr. Ezukanma, and HealthFirst Medical Group, P.A.

3

caused death, and by submitting the questions regarding their survival action for injuries that did not cause death (nonfatal injuries) conditioned on a "no" answer as to all defendants' liability for wrongful death. Because the jury found that three defendants' negligence caused Pat's death, the Cunninghams argue that the jury was not allowed to consider whether any negligence of Dr. Haroona caused nonfatal injuries. The Cunninghams do not challenge the jury's findings in their favor as to wrongful death or survival damages for injuries that caused death, nor do they challenge the take-nothing judgment in favor of Dr. Haroona or the two other defendants on their wrongful death action. They seek a reversal and remand for new trial only on their survival action as to Dr. Haroona and only as to nonfatal injuries.

### III.  Factual Background

Pat, who was sixty-three years of age at the time of her hospitalization, had been diagnosed with multiple sclerosis (MS) many years before.[5] She used a cane and sometimes a scooter for mobility around the couple's ranch near Weatherford where Bob raised cattle and maintained his prized cutting horses. Pat was able to care for her personal needs and managed the household with help. Pat also suffered intermittently from trigeminal neuralgia (TN), a condition secondary to her MS that consisted of an irritation of the trigeminal nerve. When

---

[5]Pat's MS was of the mildly progressive form. In addition to using a cane, she had some cognition and memory problems and fatigued easily, but it is undisputed that her MS had no role in her hospitalization or death.

4

active, the TN caused Pat excruciatingly severe pain in her jaw and difficulty chewing food and swallowing.

Dr. Chunduri had been Pat's treating neurologist for eleven years and had treated her for severe bouts of TN on several occasions. Previous flare-ups lasted only a few days, including a short hospitalization, after which Pat was able to resume normal eating and drinking. Numerous pain medications gave her varying degrees of relief from the intermittent TN pain. Specialized treatments for the TN had failed.

## A. Admission to the Hospital

In May of 2003, Pat had a flare-up of TN that became unmanageable despite Bob's administration of maximum levels of oral medications prescribed by Dr. Chunduri. For several days, Bob fed Pat by dipping a straw into a can of Ensure and dripping it into her mouth. On Saturday, May 24, Bob carried Pat to the hospital; Pat was in so much pain that she was biting on a towel.

## B. Dr. Chin's Care — May 24 to May 26, 2003

On Pat's admission, Dr. Chin performed a physical examination and obtained Pat's history from Bob because Pat was unable to talk. Bob told Dr. Chin that Pat had been unable to eat or drink anything for the past week because of the pain. Dr. Chin noted that Pat was in "extreme distress." Dr. Chin ordered blood tests; placed Pat on IV fluids; ordered a liquid diet with notations to "advance as tolerated" to limit aggravation of the TN associated with chewing;

5

and placed her on IV pain medication including Cerebyx, a Duragesic patch, and morphine injections.

Although Dr. Chin's order was for a liquid diet, by which he testified that he had meant a "full" liquid diet, nurses' notes in the medical record stated that Pat was served a "clear liquid diet" of approximately 500 calories every day until May 29. On Sunday, May 25, Pat was pain-free and talking. On Monday, May 26, the TN pain returned. Dr. Chin noted that her pain was severe and that she was unable to eat or drink. The hospital's dietician performed a nutritional screening for Pat on that date and rated her status as "Level IV," the highest level of nutritional risk. The dietician wrote, "[C]onsider PEG for additional nutritional support if patient with long-term pain."[6]

## C. Dr. Chunduri's Care — May 27 to June 5, 2003

Dr. Chunduri resumed care of Pat on Tuesday, May 27. He formulated a treatment plan intended to control her TN pain so that she could resume eating. He agreed with Dr. Chin's orders for IV fluids and a liquid diet at that time, and because the pain persisted over the weekend, he ordered steroids to assist with the pain. By the evening of May 28, he said Pat was feeling better. However, on that date, another dietitian visited Pat, described her diet as "negligible" for that date, maintained Pat at Level IV, and recommended consideration of a feeding tube.

---

[6]A PEG is a tube that bypasses the oral cavity and esophagus and must be inserted by a physician.

6

On May 29, Dr. Chunduri advanced Pat to a regular diet. According to the nurses' notes, Pat ate twenty-five to fifty percent of her food on May 30. By May 30, Pat's pain had largely resolved. However, around noon that day, nurses advised Dr. Chunduri that Pat had a fever of 101 degrees. Even so, Dr. Chunduri told Bob later that afternoon that he thought Pat was doing so well she could be discharged by the weekend.

**D. Dr. Ezukanma's Care — May 31 to June 2**

On May 30, Dr. Chunduri ordered a chest x-ray to investigate the possibility of pneumonia. Pat's oxygen saturation levels were lower on May 31, and her serum albumin levels had dropped. Dr. Chunduri consulted with Dr. Ezukanma, a pulmonologist, who diagnosed Pat with bilateral pneumonia.

Dr. Ezukanma examined Pat on the evening of May 31, reviewed the laboratory data, and ordered additional x-rays along with a complete blood count and blood, sputum, and urine cultures for bacteria. He determined that Pat was in mild to moderate respiratory distress with impending respiratory failure; transferred Pat to the cardiovascular ICU for closer monitoring; placed her on 100 percent supplemental oxygen with a "venti-mask"; and ordered breathing treatments, bronchodilators, and a broad spectrum of antibiotics pending returns from the cultures. Dr. Ezukanma noted that Pat might need intubation if her condition did not improve. He discussed with her that she needed to be on a ventilator to rest and that without it, she could get worse and possibly stop

breathing. Pat refused intubation at that time but agreed to allow it if her condition worsened.

On May 31 and June 1, Pat was not in pain, but she ate almost nothing. At 10:00 a.m. on June 1, Pat's oxygen level dropped below ninety percent for the first time, eighty-eight percent being the lowest range of a normal level of oxygen saturation. On June 2, nurses' notes indicated Pat's pain returned, and she was struggling to breathe. The chart reflected that she ate no breakfast or dinner and only five percent of her lunch. Dr. Chunduri still thought, based on his experience with TN and past treatment of episodes suffered by Pat, that the pain would be gone in a couple more days so that a nasogastric (NG) or other feeding tube would not be necessary. He increased her pain medication. Pat again refused intubation, informing Dr. Ezukanma that she did not want a tube down her throat. From additional x-rays and blood work, Dr. Ezukanma concluded that she was stable.

At 7:30 p.m. on June 2, Pat's oxygen level dropped to a range between the "mid-80's" and seventy-seven percent "when agitated," with the venti-mask on. Pat was moved to the neurointensive care unit where Janet Koch, the certified neurological nurse on duty for the night, noted upon receiving Pat in the unit that Pat was confused with shallow and labored respirations of forty-four per minute and oxygen saturation of seventy-seven percent. At 8:00 p.m., Nurse Koch noted that Pat was uncooperative and was repeatedly removing the venti-mask. At 9:45 p.m., Nurse Koch found Pat out of bed, teetering and leaning on a side

rail, having removed both the mask and the EKG leads. Three nurses assisted Pat back to bed. Pat's oxygen level worsened as her agitation increased, and she continued to pull off the mask.

**E. Dr. Haroona's Care — Night of June 2 to Early Morning of June 3**

Dr. Haroona, a pulmonologist associated with Dr. Ezukanma in the HealthFirst Medical group, assumed on-call duties for Dr. Ezukanma's patients on the evening of June 2.[7] Dr. Haroona's first knowledge of Pat was a call from Nurse Koch at 11:00 p.m., when Nurse Koch informed him that Pat was agitated with rapid, shallow, and labored respirations and oxygen percentages in the seventies. He recalled that Nurse Koch probably told him that Pat had been out of bed and that three nurses had to get her settled back into bed. He acknowledged that he was told about Pat's TN and that she could not tolerate the venti-mask and was removing it, but he testified that he was not told that she could not tolerate the mask because of pain.

Dr. Haroona ordered a tighter-fitting mask called a "BiPAP" to be on standby along with Vistaril, a sedative, to reduce Pat's agitation. Dr. Haroona testified that he did not order intubation at that time because Nurse Koch informed him that Pat did not want it and also because Pat was agitated. Her oxygenation was going up and down, and he decided to first try the BiPAP with Vistaril to control her agitation and to see if her oxygenation improved. He

---

[7]Dr. Haroona is now deceased. *See* Tex. R. App. P. 7.1(a)(1).

9

explained that intubation is a last resort and that the BiPAP performs the same function as a ventilator if the patient is able to tolerate it. Dr. Haroona explained that a BiPAP mask has pressure coming from the machine that pushes positive air so that the patient does not have to exert as much effort to breathe; it is a kind of ventilator but does not involve a tube down the patient's throat. The BiPAP was placed on Pat at 11:45 p.m. With the BiPAP mask on, Pat's oxygen level rose to ninety-seven percent by 12:01 a.m.

At 12:45 a.m., Nurse Koch recorded that Pat, despite having wrist restraints, pulled the BiPAP mask off and yelled, "I don't want that on. It's too tight. I can't breathe." Nurse Koch discussed Pat's current status with her and asked her desires, to which Pat responded that she did not want the mask back on and also did not want a "vent," although she did not seem to comprehend the explanation. Nurse Koch called Dr. Haroona to report the incident, including that Pat was refusing to wear the BiPAP and that her oxygen had fallen to fifty-two percent. Dr. Haroona ordered that Pat be placed back on the prior mask and nasal cannula.

Dr. Haroona testified that Pat's reaction to the BiPAP was not unusual because the BiPAP as a mode of support is difficult to get used to until the body synchronizes with it. He was not surprised by the low level of oxygen saturations because Pat was very agitated and yelling, pulling the air out of her lungs, probably not taking time for a deep breath, and pulling the mask off. He testified that "you want to work with the patient . . . [and] watch [her] back on the previous

10

mode and see how [she] do[es]" and that, when the patient is calmer, he would talk to her again about putting the BiPAP back on.

After bathing Pat, Nurse Koch called Bob at 1:50 a.m. and asked him to come to the hospital to help with Pat. At 2:10 a.m., pursuant to earlier orders from Dr. Haroona, Nurse Koch obtained an arterial blood gas reading of critically low oxygen of 43.2 percent, which correlates to oxygen in the seventies by pulse oximeter; the first draw was questionable, and a second draw was obtained at 2:35 a.m. Nurse Koch again called Dr. Haroona, who declined to intubate Pat without her consent based on her previous refusals.

At 3:00 a.m., Nurse Koch again called Bob, who was still on his way to the hospital and advised him of the situation; Bob gave his consent to intubate Pat and to place her on a ventilator. When advised that Pat was unable to make decisions and that Bob wanted her intubated, Dr. Haroona then ordered Pat intubated at 3:10 a.m.

Dr. Haroona testified that he only later learned from reviewing the hospital records before trial that, at 1:00 a.m. after the BiPAP was removed, Pat's oxygen fell to seventy-two percent with the previous mask back in place, she was incontinent of stool with very labored respirations, and she was not able to answer orientation questions coherently, including her name, only verbalizing a rare word. Dr. Haroona testified that had he been advised of those events, they would have indicated to him that Pat was unable to give consent for intubation at that time.

11

In Dr. Haroona's opinion, based upon his review of all of the records after suit was filed, Pat's incontinence and loss of coherence were the result of showers of clots being disseminated throughout her body from the effects of DIC, which was developing in her blood at the time in question. As described by other witnesses, DIC is a condition consisting of a catastrophic series of events that occurs in the presence of sepsis, resulting in marked disturbance of clotting factors that cause coagulation and clots as well as bleeding, which further results in strokes and damage to other organs. Several experts testified at trial that the medical community does not know what causes DIC.

Bob described Pat as "blue" and almost not breathing when he arrived at her bedside a few minutes after Nurse Koch's last call to him. Her eyes were closed, he said, and she said nothing. When Dr. Haroona was questioned about the urgency of his order at trial, he testified that an order to intubate is considered a "stat" order when a patient is in ICU. CRNA Neil Neal and respiratory technician Michael Hicks completed Pat's sedation, intubation, and placement on the ventilator without difficulty at 3:30 a.m. Bob went home while Nurse Koch watched Pat closely, monitoring her sedation. By 4:45 a.m., Nurse Koch noted that Pat was showing good signs and varying degrees of responsiveness.

## F. Cascade of Events

When Dr. Chunduri saw Pat the next morning, June 3, her condition was critical. He confirmed that Pat had developed "sepsis," which meant that an infection had penetrated the bloodstream and was affecting other organs, as a

result of which she developed DIC. Thereafter, Pat continued to deteriorate. Dr. Chunduri ordered CT scans taken on June 3 and 4. The June 3 CT scan was normal, but the June 4 scan showed areas of discrete infarcts in the bi-frontal region, the bi-occipital region, and the right cerebellum of Pat's brain. By midday on June 4, Dr. Chunduri told Bob that he thought that Pat might not live. A hematologist was consulted, and because Pat's kidneys were also failing, a nephrologist placed her on dialysis. By that time, Pat was deeply comatose and totally unresponsive.

## G. Life Support Removed

By June 5, Pat was so swollen that her skin had split open. She was bleeding from every orifice, she had gangrene in all extremities, and her grossly discolored legs were black from the knees down. At Bob's insistence, Dr. Ezukanma was replaced by another pulmonologist. Also, the nephrologist recommended on June 6 that Pat be removed from life support. The family accepted his recommendation, and Pat was allowed to die on June 7, 2003. Pat's death certificate listed cardiorespiratory arrest due to bilateral extensive pneumonia as the immediate cause of death with acute renal failure as a significant condition contributing to her death. It was the consensus of all experts that the pneumonia was nosocomial (hospital acquired) and probably caused by bacteria, although none was ever identified.

# IV. This Suit

## A. Pleadings

In their live pleadings at the time of trial, the Cunninghams asserted causes of action for medical negligence against seven health care providers pursuant to former article 4590i.[8] The Cunninghams sought damages pursuant to the Wrongful Death Act and the Texas Survival Statute.[9] Their pleadings alleged that Pat had been suffering from malnutrition from inability to eat due to TN pain upon admission to the hospital and that failure of the named healthcare providers to properly assess and treat her nutritional needs continued unaddressed for two weeks in the hospital to the point that she died from complications of malnutrition. They further alleged that Pat developed pneumonia while in the hospital; that the malnutrition compromised her immune system, which thereby lessened her ability to fight the pneumonia and increased the risk of its complications; that the named pulmonary healthcare providers further caused her to suffer recurrent episodes of hypoxemia (lack of oxygen in her blood); and that failure to properly treat her respiratory condition, including

---

[8]*See* former Tex. Rev. Civ. Stat. Ann. art. 4590i (repealed 2003) (current version at Tex. Civ. Prac. & Rem. Code Ann. §§ 74.001 (West Supp. 2012), .002–.507 (West 2011)).

[9]*See* Tex. Civ. Prac. & Rem. Code Ann. §§ 71.001–.004, .021 (West 2008).

14

failure to timely intubate her, led to her strokes, brain injury, and a "cascade" of events including sepsis, DIC, and multi-organ failure that resulted in her death.[10]

## B. The Jury Charge

The Cunninghams' proposed jury charge included two sets of questions regarding negligence liability, percentage of responsibility, and damages attributable to each of the defendant healthcare providers. The first set of proposed questions related to their survival action; the second, separate set of proposed questions concerned their wrongful death action.

On the Friday before closing arguments, the trial judge provided a draft of a proposed charge to the parties that included the two sets of questions as requested by the Cunninghams. The trial judge stated, in response to extensive objections and argument by defense counsel, that he believed that the wrongful death and survival claims had "to be submitted separately under *Casteel* or you will be back here . . . ," further stating his belief that there were matters "that I think are some evidence of predeath injuries to [Pat]." However, on the morning of closing arguments after a long weekend, the trial judge furnished the parties with a new, redrafted charge to which both sides made their formal objections.

---

[10]Specifically as to Dr. Haroona, in addition to the foregoing, the Cunninghams alleged that he failed to meet the standard of care of an on-call pulmonologist and critical care physician during the night of June 2 and the early morning of June 3, causing damages to Pat that included physical pain and mental anguish, physical impairment, disfigurement, and medical expenses.

15

As redrafted and submitted to the jury, Question 1 of the court's charge asked whether any of the defendants' negligence proximately caused "the death of Patricia Cunningham." Question 2 was a percentage of responsibility question. Question 4 submitted survival damages and asked what sum of money would have compensated Pat for "[p]ain and mental anguish" she experienced "as a result of the injuries in question before her death," as well as physical impairment, disfigurement, and medical expenses for treatment of her injuries.[11]

Question 8 submitted a separate survival act liability claim inquiring whether the negligence of any of the defendants proximately caused injury to Pat "prior to her death." Question 9 concerned the percentage of each defendant's responsibility for the jury's answer to Question 8, and Question 10 inquired about damages for Pat's pain and mental anguish, physical impairment, disfigurement, and medical expenses for treatment of her injuries "as a result of the injuries in question before her death." However, the jury was instructed to answer Questions 8 through 10 only if it had "answered 'No' as to each [of those named above] in response to Question 1" and to not answer those questions if it had answered "Yes" for any defendant in response to Question 1. Because it answered "yes" to Question 1 for three defendants, the jury did not answer Questions 8, 9, and 10.

---

[11]Not at issue in this appeal, Questions 3, 5, and 6 inquired about wrongful death damages for Bob and the Cunninghams' daughters, and Question 7 asked whether any defendants acted with gross neglect in causing Pat's death.

16

## C. Causation Evidence

Each link in the Cunninghams' theory that a chain of events caused Pat's death was hotly contested. Thirty-four witnesses testified. Among them were family members, nurses, dietitians, a nontreating nutritionist expert, a respiratory therapist, a hospital administrator, a number of nontreating physician experts for both the Cunninghams and the defendants in various disciplines and specialties, and each defendant. The major battle of the trial was fought outside the presence of the jury concerning the qualifications and reliability of the Cunninghams' expert witnesses. In lengthy *Robinson/Daubert* hearings before and during trial, the trial court considered over six hundred pages of peer-reviewed and published scientific articles and epidemiological studies made a part of the record regarding the reliability of the experts' opinions relating to malnutrition. Dr. Haroona's role as on-call pulmonologist during the four hours and ten minutes between 11:00 p.m. on June 2 and 3:10 a.m. on June 3 did not involve Pat's alleged malnutrition, but Dr. Haroona's role can only be properly considered in the context of the evidence regarding Pat's treatment and care during her two-week hospitalization.

### 1. Dr. Lasswell

The trial court permitted Anita Lasswell, Ph.D., a registered dietician called as a nutrition expert by the Cunninghams, to testify regarding general causation principles applicable to malnutrition and its relationship to immune function and

infection.[12]  In Dr. Lasswell's opinion, Pat was suffering from protein malnutrition upon her admission to the hospital, as shown by the records of her history, physical findings, and lab values.

Dr. Lasswell testified at length that a generally accepted "link" exists between reduced serum albumin (a protein in the blood) and markedly increased morbidity and mortality, particularly including pneumonia and death by pneumonia.  It is general nutritional knowledge, she said, that low serum albumin is "highly correlated" with the risk of morbidity, meaning disease, and mortality, meaning death, and particularly death from pneumonia.

Dr. Lasswell testified that, as the level of serum albumin in the blood drops, the risk of morbidity and mortality increases.  Values of serum albumin of 2.4 (g/dl) or lower, she said, are critical levels at which the risk increases significantly.  Based on studies offered for record purposes to support the reliability of her testimony, she testified that when the serum albumin level is below 2.4, the risk of dying from pneumonia is over ten times that of a person with normal serum albumin.

---

[12]The Cunninghams' theory of the role of malnutrition in Pat's death was akin to a toxic tort case requiring proof of both general causation, which asks whether a condition (such as exposure to a substance or, in this case, malnutrition) is capable of causing injury or disease in the general population, and specific causation, which asks whether the plaintiff's injury or disease was caused by that substance.  *See Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714–15 (Tex. 1997), *cert. denied*, 523 U.S. 1119 (1998); *see also Faust v. BNSF Ry. Co.*, 337 S.W.3d 325, 333 (Tex. App.—Fort Worth 2011, pet. denied) (collecting federal and state cases addressing general and specific causation).

18

The lab reports, she acknowledged, reflected Pat's serum albumin was 3.7 at the time of her admission to the hospital, seemingly within normal range. But Pat was admitted with such severe jaw pain that, according to her husband, she had not eaten or had anything to drink for approximately a week before admission. Four days later, after she was rehydrated by IV infusion, the lab reports showed her serum albumin had fallen to 2.7, indicating protein malnutrition had existed upon admission but had been masked by dehydration. Dr. Lasswell further noted that Pat's serum albumin had fallen to 2.4 by May 30. In Dr. Lasswell's opinion, no oral diet would have sufficed to halt Pat's nutritional decline because she could not eat because of the pain. In her opinion, Pat needed a feeding tube and that, until May 31, it would have been easy to feed Pat by tube if it had been delivered in a timely manner and in sufficient amounts.

By June 2, although Pat was on a regular diet, the nurses' notes showed that she ate nothing at breakfast or dinner and only five percent of her lunch. The visiting nutritionist again rated Pat at "high nutritional risk . . . times nine days," at Level IV. Combined with the alleged week of not eating before she came into the hospital, Dr. Lasswell estimated that Pat's poor nutrition had continued for approximately sixteen days at that point. The hospital's dietician on that date recommended "PPN," meaning peripheral parenteral nutrition (feeding through a vein). No action was taken to address or implement that or any of the previous recommendations. On June 3, after Pat was intubated, the dietician visited again, leaving a note in the chart and recommending nutritional support

19

through a NG tube. Again, nothing was done to implement that recommendation. At 2:45 p.m. on that date, the dietician wrote a note to Dr. Chunduri to spur some action. On June 5, the consulting kidney doctor assessed Pat as "malnourished." Nutritional enteral therapy was then started, but by that time it was ineffective.

### 2. Allan Naarden, M.D.

Dr. Allan Naarden, the Cunninghams' expert neurologist, agreed with Dr. Lasswell that, based upon the medical records, Pat was clearly malnourished when she was admitted to the hospital and that her malnutrition continued and worsened. Dr. Naarden confirmed that, while malnutrition does not cause infection or pneumonia, it causes a person's immune system to become compromised, affecting the body's ability to mount a defense to infection such as pneumonia. The resulting protein depletion also affects the body's ability to recover. Dr. Naarden cited clinical studies and reports stating that the risk of death of a person who is malnourished is four to six times greater than for a normal person.[13]

In his opinion, Pat's death would have been averted if she had been given a feeding tube as late as June 2. Additionally, in Dr. Naarden's opinion, the pneumonia caused Pat to suffer respiratory distress and hypoxia, a severe depletion of oxygen in her system, beginning on May 31. She was "cyanotic" at

---

[13]The most commonly used indicator for malnutrition, he agreed, is the level of serum albumin in the blood. If the level is less than 3.5 g/dl, the risk is two to four times that of a normal person. In Dr. Naarden's opinion, early nutrition would have decreased Pat's risk of infection within three to five days.

12:45 a.m. on June 3 when Dr. Haroona ordered nasal oxygen and arterial blood gasses. Dr. Naarden believed she had a respiratory collapse, or at least a "hypoxic event," between 2:00 and 3:00 a.m. on June 3.

Dr. Naarden noted that Pat was agitated early on June 3, for which Dr. Chunduri had ordered injections of Thorazine in twice the amounts previously given, followed by Ativan and Stadol. These medications, in Dr. Naarden's opinion, caused hypotension, a dramatic drop in blood pressure. While Dr. Naarden could not rule out clots resulting from DIC as a cause of the brain damage, he testified that hypoxia and hypotension, in combination, caused Pat's strokes and brain damage. In his opinion, the combined hypoxia and hypotension "played a role" in her death.

In summary, Dr. Naarden testified to a chain of causation that he likened to a "series of dominoes." In his opinion, Pat died of multi-organ failure as the eventual result of malnutrition that was not addressed, which caused her to become immunocompromised and opened the door to her infection, which entered her bloodstream and caused the sepsis and DIC, and which caused impaired ability to remove toxins and hemorrhages and infarcs; she became severely hypoxic from the pneumonia and suffered an episode of hypotension, which also combined to deplete her resources and cause the strokes. In his opinion, Pat became more likely to die than not on June 3 or 4, within the time frame of the strokes and after the hypoxic episode, and she suffered multi-organ failure and died as the end result of these events.

21

Dr. Naarden testified as to standards of care, breach, and causation only with respect to Drs. Chin and Chunduri. Dr. Naarden had no specialized training in pulmonary diseases, nor was he board certified in pulmonary care or infectious disease. The trial court ruled that Dr. Naarden was not qualified to testify about the pulmonologist standard of care applicable to Dr. Haroona. Consequently, Dr. Naarden provided no expert testimony regarding Dr. Haroona's standard of care or breach, nor did he provide any opinion regarding proximate causation of any injury or death resulting from Dr. Haroona's care of Pat.

### 3. Joseph Varon, M.D.

Dr. Joseph Varon, the Cunninghams' expert pulmonologist and critical care physician, likewise testified that in his opinion the cause of Pat's death was "a series of events" that "led to the mismanagement of a potentially reversible condition characterized by respiratory failure" resulting in "a situation where this lady was not able to fight an infection -- she did not have enough nutrients in her system -- and a situation in which she did not have enough energy for her to be able to breathe," and her lungs, kidneys, and multiorgan system failed. Dr. Varon opined that, once Pat developed the infection and consequent respiratory failure, all of the organs began failing, starting with the lungs and kidneys and followed by the coagulation system. He testified that "that's what we call multiorgan system dysfunction." In his opinion, the malnutrition led to the infection, which led ultimately to her death. Dr. Varon believed that nutritional support would have sufficiently restored Pat's immune system status in three to five days and

that she would more than likely have survived if she had received nutritional support beginning as late as June 1 or 2.

In Dr. Varon's opinion, Pat also suffered frequent and repetitive episodes of low oxygen as early as May 31, June 1, June 2, and the early morning hours of June 3, some of which were particularly severe. In his opinion, Pat needed assisted ventilation by May 31, as shown by the record of her shallow, rapid breathing pattern and borderline oxygenation; by the morning of June 2 she could not breathe, she was removing her mask, and she was given medication for anxiety and confusion; by 9:45 p.m., she was still very labored with oxygen in the seventies; and after midnight she lost continence with respirations from thirty to fifty breaths per minute, suffering "air hunger," which would feel "[as] if you are choking." He testified that the "series of consecutive and repetitive" low oxygen levels culminated in a severe, hypoxic brain injury in the early morning hours of June 3. He acknowledged that a hypoxic brain injury did not show up on the CAT scans, but he believed the nature of the hypoxic brain injury was a "continuum" such that the swelling of the brain and other results might not show up for two or three days. In his opinion, assuming that Pat had been intubated promptly and "everything [had been] done right" on June 3, her likelihood of surviving was more than fifty percent, but with the twenty-minute delay on June 3 in carrying out Dr. Haroona's intubation order, her chances of living became less than fifty percent. In his opinion, by June 4, Pat was not going to survive.

Dr. Varon testified as to standards of care of a pulmonologist regarding hypoxia as to both Dr. Ezukanma and Dr. Haroona. As to Dr. Haroona's role as on-call pulmonologist for the night of June 2 and early morning hours of June 3, Dr. Varon testified that the applicable standard of care required Dr. Haroona to go to the hospital to see the patient if he received a call from a nurse that a patient was in distress with a dangerously low oxygen saturation; make arrangements for adequate oxygenation support, which in this case required intubation; recognize that if a patient is on a BiPAP mask and not improving, intubation was needed rather than reverting to a mask that was not working; recognize that the situation was an emergency and order the intubation done "stat"; and make sure the patient did not receive medications that are dangerous such as Vistaril, which may decrease the respiratory status. Dr. Varon's opinion was that Dr. Haroona breached the standard of care in each regard. However, Dr. Varon was not asked about and did not offer any testimony as to whether any act or omission by Dr. Haroona was a proximate cause of injury to, or the death of, Pat.

## V. Analysis

The Cunninghams contend that even though the jury failed to find that any negligence of Dr. Haroona caused Pat's death, there was evidence that he was negligent in causing other injuries to Pat that did not contribute to her death, such as pain and suffering, mental anguish, and brain injury. The Cunninghams thus contend that the trial court erred by refusing to submit their proposed jury

24

questions that would have allowed the jury to consider whether Dr. Haroona's alleged negligence caused nonfatal injury prior to Pat's death and by instead submitting the survival cause of action in such a way that the jury's consideration of those questions as to Dr. Haroona was predicated upon findings of "no" as to all defendants listed in Question 1, the wrongful death liability question. Because the jury did not answer "no" as to all defendants but answered "yes" as to three defendants in response to the wrongful death liability question, it followed the trial court's conditioning instruction and did not answer Questions 8 through 10.

The Cunninghams do not contest the jury's answer of "no" to Question 1 as to Dr. Haroona. They challenge only the jury's consequent inability to consider whether any negligence on his part nevertheless caused nonfatal injury and damages to Pat in answer to Questions 8, 9, and 10. Dr. Haroona contends that the Cunninghams waived any error in the charge by failing to object to the conditioning instruction that followed Question 7. Dr. Haroona also argues that, in any event, there was no evidence that his negligence caused nonfatal injuries (distinct from injuries that caused death), meaning the Cunninghams were not entitled to the submission of Questions 8, 9, and 10.

## A. Standard of Review

Errors in conditioning jury questions are a variation of error in the omission or refusal to submit a claim, a defense, or an element thereof. *See Ortega v. LPP Mortg., Ltd.*, 160 S.W.3d 596, 601–02 (Tex. App.—Corpus Christi 2005, pet. denied) (holding that improper ordering of validity of transfers and homestead

25

exemption questions "put the cart before the horse" and that trial court erred by instructing jury that question number two could be answered only if question number one were answered affirmatively); *Varme v. Gordon*, 881 S.W.2d 877, 881 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (holding improper predication that precludes jury from answering a question on a ground of recovery or defense constitutes reversible error).

Rule 278 requires the trial court to submit questions "raised by the written pleadings and the evidence." Tex. R. Civ. P. 278. Jury questions submitted must fairly place the disputed issues before the jury, and controlling issues of fact must be submitted to the jury. *City of The Colony v. N. Tex. Mun. Water Dist.,* 272 S.W.3d 699, 746 (Tex. App.—Fort Worth 2008, pet. dism'd). That rule provides "a substantive, non-discretionary directive" to trial courts that requires submission to the jury of requested questions if any pleadings and evidence support them. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992); *Brown v. Goldstein,* 685 S.W.2d 640, 641 (Tex. 1985) (holding refusal to submit a question is error if there is any probative evidence to support an affirmative finding); *Sw. Bell Tel. Co. v. Thomas,* 554 S.W.2d 672, 674 (Tex. 1977) (op. on reh'g).

The trial court is obligated to submit a question on a controlling issue if evidence to support the submission amounts to more than a scintilla. *Elbaor,* 845 S.W.2d at 243. To determine if a trial court erred in refusing to submit requested questions, we must view the evidence as if the trial court had instructed a verdict against the party seeking the submission. *Id.; Phillips*

*Pipeline Co. v. Richardson*, 680 S.W.2d 43, 48 (Tex. App.—El Paso 1984, no writ). We consider the evidence in the light most favorable to the party whose questions were refused; if there is conflicting probative evidence in the record, the questions are for determination by the jury. *Elbaor*, 845 S.W.2d at 243.

Likewise, rule 277 requires a trial court to submit a cause in broad-form questions whenever "feasible," but broad-form submission cannot be used to put before the jury issues that have no basis in the law or in the evidence. *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 215 (Tex. 2005) (citing *Harris Cnty. v. Smith*, 96 S.W.3d 230, 234 (Tex. 2002)). And it may not be "feasible" to submit a single, broad-form question that incorporates wholly separate theories of liability. *See* Tex. R. Civ. P. 277; *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 390 (Tex. 2000).

## B. Survival and Wrongful Death Actions

At common law, a claim for personal injuries did not survive the death of the injured person. *See Russell v. Ingersoll–Rand Co.,* 841 S.W.2d 343, 344 (Tex. 1992); *see also Landers v. B.F. Goodrich Co.,* 369 S.W.2d 33, 35 (Tex. 1963). In 1895, the legislature abrogated the common law rule by enacting the survival action statute, which provides in pertinent part that "[a] personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person." Tex. Civ. Prac. & Rem. Code Ann. § 71.021(b); *see* Act of May 4, 1895, ch. 89, 1895 Tex. Gen. Laws 143 (now codified at Tex. Civ. Prac. & Rem. Code Ann. § 71.021(b)); *Russell,* 841 S.W.2d at 344. The damages

27

recoverable are those that the decedent sustained while alive for personal injury to the "health, reputation, or person of an injured person." Tex. Civ. Prac. & Rem. Code Ann. § 71.021; *Borth v. Charley's Concrete Co.,* 139 S.W.3d 391, 395 (Tex. App.—Fort Worth 2004, pet. denied). Any recovery flows to those who would have received it had the decedent obtained the recovery immediately prior to her death—that is, her heirs, legal representatives, and estate. *Borth*, 139 S.W.3d at 395; *see Russell,* 841 S.W.2d at 345.

The parties to a survival action seek adjudication of the decedent's own claims for alleged injuries inflicted upon her by the defendant, for which she would have had a cause of action had she remained alive. *Borth,* 139 S.W.3d at 395. The damages recoverable include those for physical pain and suffering, mental anguish, property damage sustained by the decedent before death, and related medical expenses and funeral expenses. *Id.* Only pain and mental anguish that the deceased consciously experienced is compensable. *Las Palmas Med. Ctr. v. Rodriguez,* 279 S.W.3d 413, 417 (Tex. App.—El Paso 2009, no pet.); *Borth*, 139 S.W.3d at 395. When the existence of some pain and mental anguish is established, the jury is given considerable discretion in determining the amount of fair and reasonable compensation for the decedent's pain and mental suffering. *Lee Lewis Constr., Inc. v. Harrison*, 64 S.W.3d 1, 14 (Tex. App.—Amarillo 1999), *aff'd*, 70 S.W.3d 778 (Tex. 2001).

There was likewise no common-law cause of action for damages arising from a tort victim's death. *See Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348,

356 & n.7 (Tex. 1990); *see also Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 403 & n.5 (Tex. 1993). Through the Wrongful Death Act, the legislature created a new cause of action to allow a deceased tort victim's surviving parents, children, and spouse to recover damages for their losses from the victim's death. *Shepherd v. Ledford*, 962 S.W.2d 28, 31 (Tex. 1998); *see* Tex. Civ. Prac. & Rem. Code Ann. §§ 71.002–.004.

The Wrongful Death Act authorizes recovery only for negligent conduct that actually causes death. Tex. Civ. Prac. & Rem. Code Ann. § 71.002(b); *Kramer*, 858 S.W.2d at 404 (noting that plain meaning of Wrongful Death Act imposes statutorily-required "link" between injury caused by negligence and death). In contrast to a survival action, damages recoverable in a wrongful death action are for the exclusive benefit of the defined statutory beneficiaries and are meant to compensate them for their own personal loss. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 644 (Tex. 2009) (orig. proceeding). Damages recoverable by the statutory beneficiaries under the Wrongful Death Act include pecuniary losses to the beneficiaries, such as loss of inheritance and non-economic damages to compensate for the losses caused by the destruction of the familial relationship. *See Moore v. Lillebo*, 722 S.W.2d 683, 687–88 (Tex. 1986).

A controlling issue is one that requires a factual determination to render judgment in a case. *Collins v. Beste*, 840 S.W.2d 788, 790 (Tex. App.—Fort Worth 1992, writ denied). Thus, whether a party's negligence caused injury to the decedent prior to death is a controlling issue in a survival action. *See* Pattern

Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 17.3, Comment (2010) (recommending submission of survival damages question for decedent's pain and mental anguish, medical expenses, and funeral and burial expenses). Whether the injury caused the death is immaterial in a survival action because wrongful death and survival actions are distinct causes of action. *Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 924 (Tex. 1993) ("[They] are independent of one another, and the availability of one should in no way affect the other."); *Landers*, 369 S.W.2d at 35 (stating wrongful death and survival actions are separate and distinct causes of action); *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 865 (Tex. App.—Fort Worth 2005, no pet.) (holding, although jury failed to find in favor of plaintiffs on wrongful death claim for death caused by sepsis, septic shock, and multi-system failure, evidence was legally and factually sufficient to support separate finding on survival claim for pain and mental anguish to decedent caused by stage three necrotic decubitus ulcer).

Here, the Cunninghams pleaded two distinct and separate causes of action against Dr. Haroona, one for negligently causing Pat's death and the other for injury not resulting in death. If there was evidence that negligence of Dr. Haroona proximately caused injury to Pat that did not result in her death, the Cunninghams were entitled to separate submission of liability and damage questions for the survival action not conditioned on negative findings regarding the wrongful death action.

## C. Preservation of Charge Error

Dr. Haroona first contends that the Cunninghams waived any error in the charge because their requested questions were not in substantially correct form because their proposed liability question regarding survival damages did not inquire as to "injuries *prior to her death*," and they did not submit an accompanying definition of the term "injury" that might have clarified the injury inquired about. [Emphasis added.] We disagree. The Cunninghams requested an instruction in connection with their proposed Question 3 regarding survival damages that limited "pain and mental anguish" to conscious physical pain and emotional pain, torment, and suffering "experienced by Patricia Cunningham *before her death* as a result of the injuries in question." [Emphasis added.] This instruction tracked the suggested instruction for survival damages in the Pattern Jury Charge. *See* Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 17.3, Comment (2010) (setting out survival damages question for decedent's pain and mental anguish, medical expenses, and funeral and burial expenses).[14]

---

[14]Counsel for Dr. Chunduri argued in opposition to the proposed charge that the Cunninghams' counsel had not yet asked for "a [proper] survival question," further asserting that "if she doesn't, *even if we don't submit nonfatal injuries to the jury*, she can't get it reversed because she has got to show the Court of Appeals how it should have been properly submitted. And . . . she can't do it." [Emphasis added.] To this argument, the trial court responded, "I understand what you're saying. . . . I spent a lot of time looking at this yesterday afternoon. . . . [W]e have an unusual universe of evidence in this case because there are matters in the record that I think are some evidence of predeath injuries to [Pat]."

Dr. Haroona further contends that the Cunninghams waived any alleged error concerning Questions 8 through 10 because they failed to object to the trial court's conditioning instruction at the end of Question 7. Absent a specific objection to that conditioning instruction, Dr. Haroona argues that merely referencing their previously requested jury questions during counsel's oral objections to the charge was insufficient to notify the court of a defect or error in the charge and was insufficient to "identify the defect" in the charge as submitted. We decline that invitation to find waiver for the following reasons.

It is clear that the trial court understood that the Cunninghams' initial written request was for two separate sets of questions, because the court had proposed to submit those very questions as they requested on the previous Friday as shown by its original proposed charge that would have submitted the Cunninghams' two separate sets of questions. The following Tuesday, when presented with the trial court's newly revised charge a few minutes before closing arguments, the Cunninghams' attorney objected to the questions as ultimately submitted by the trial court and then twice asked for submission of their two requested, separate sets of questions.[15]

---

[15]The Cunninghams also objected before the jury was discharged that the verdict was incomplete because the jury had not answered Questions 8 through 10 and that there was "no mechanism for the jury to have considered, and they did not consider, the damages to Patricia Cunningham except and apart from any damages that [were] related to her death . . . ."

32

In addition to again asking for submission as in their written requests for separate sets of jury questions regarding the survival action and the wrongful death action, the Cunninghams' counsel objected to the trial court's newly proposed Question 1 because it used the word "death" instead of "injury" or "occurrence," and she orally requested that there should be two liability questions if "death" were included in the charge, "one for death and one for the survival cause of action" using the word "injury" or "occurrence," as previously requested in writing. Further, she again objected to the word "death" in Question 1 if the Cunninghams' requested questions containing two separate liability questions were not going to be submitted and, in the alternative, that the word "death" should not be used in Question 1. The trial court denied the Cunninghams' requested jury questions and overruled their objections to the charge on the record.

The trial court clearly understood the Cunninghams' complaint, and this is all that was required. "There should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 226–27 (Tex. 2010) (quoting *State Dep't of Highways v. Payne,* 838 S.W.2d 235, 241 (Tex. 1992) (op. on reh'g)); *see Thota v. Young*, 366 S.W.3d 678, 690 (Tex. 2012) ("[W]e have long favored a common sense application of our procedural rules that serves the purpose of the rules, rather than a technical application that rigidly

33

promotes form over substance."). Even if their objections were somehow less than clear, the Cunninghams preserved error by their requested questions that would have submitted their survival act damages separately.

The trial court's refusal to submit the Cunninghams' survival act claim separately from the wrongful death claim as they had requested constituted a refusal to submit their survival act theory as to Dr. Haroona and the other two defendants who were not found to have caused Pat's death. *See Payne,* 838 S.W.2d at 241 (holding that even if objection by the State failed to make clear that the charge submitted only a special defect theory and not a premises defect theory, the State preserved error by its requested jury question that would have submitted premises defect theory to jury, and trial court's refusal to submit the requested question constituted a clear refusal to submit the premises defect theory).

Moreover, Dr. Haroona's argument that the Cunninghams waived error by failing to object specifically to the conditioning language is based upon an inapplicable line of cases. We are aware of the line of cases holding that failure to object waives error as to an improper conditioning instruction, but those cases involved conditioned elements of a single claim as to which omitted answers are deemed found in support of judgment pursuant to rule 279.[16] None of the cases

---

[16]*See Little Rock Furniture Mfg. Co. v. Dunn*, 148 Tex. 197, 203–04, 222 S.W.2d 985, 989–90 (1949) (holding party that failed to object to instruction conditioning submission of jury question on answer to previous question waived right to finding as to subsequent question and answer must be deemed found in

34

that we have found involved a conditional submission of a distinct claim or theory as contrasted with an element of a single theory. The Cunninghams could not be held to have waived submission of their distinct and separate theory of damages under the survival act when, in accordance with rule 279, which provides that a party waives an entire theory or defense *by not requesting* or objecting to its omission from the charge, they both requested those issues and objected to the trial court's failure to submit their survival claim. *See Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 565–66 (Tex. 2002) (discussing and comparing consequences of waiver by failure to object to omission of entire theory from charge versus deeming omitted elements of incomplete submission found in support of judgment in absence of objection); *see also BML Stage Lighting, Inc. v. Mayflower Transit, Inc.,* 66 S.W.3d 304, 306 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (op. on reh'g) (holding inapplicable the line of cases that addresses lack of objection to improper conditioning because the conditioned jury question at issue was for an entirely separate claim from that inquired about in prior question).

---

favor of judgment), *modified on other grounds by Bradford v. Arhelger,* 161 Tex. 427, 340 S.W.2d 772 (1960); *Tex. Emp'rs' Ins. Ass'n v. Ray,* 68 S.W.2d 290, 295 (Tex. Civ. App.—Fort Worth 1933, writ ref'd) (same); *see also Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 650–52 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (op. on reh'g) (same); *Hunter v. Carter,* 476 S.W.2d 41, 46 (Tex. Civ. App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.) (holding party waived jury findings as to unanswered questions by not objecting to conditional submission of those questions); *Whiteside v. Tackett*, 229 S.W.2d 908, 912 (Tex. Civ. App.—Austin 1950, writ dism'd) (same as *Hunter*); *Bankers Standard Life Ins. Co. v. Atwood,* 205 S.W.2d 74, 77 (Tex. Civ. App.—Austin 1947, no writ) (same).

Twenty years ago, Justice Hecht observed in *Payne* that "[t]he procedure for preparing and objecting to the jury charge has lost its philosophical moorings." 838 S.W.2d at 241. Coming at "that very difficult point of the trial between the close of the evidence and summation," the procedure "ought to be simpler." *Id* at 240.[17] The process must be carried out under intense pressure "just when counsel is contemplating the last words he or she will say to the jury." *Id.* In this case, that pressure was exacerbated by the trial court's substitution of a newly revised charge on the morning of closing arguments to the jury after having provided the lawyers with what they believed would be the charge to use in preparing their closing arguments to the jury over the weekend. Participating in a formal charge conference in the face of an unexpected last-minute change in a proposed charge with the jury waiting would have been daunting to the most experienced trial or appellate specialist and disserves the fair and just presentation of the case to the jury*. See Payne,* 838 S.W.2d at 240. Nevertheless, the Cunninghams sufficiently preserved their contention that the trial court erred by failing to submit the survival cause of action questions

---

[17]As his opinion in *Payne* noted, the supreme court had appointed a task force the year before to study and recommend changes to simplify jury charge procedures*. Id.* at 241*.* The task force subsequently submitted its report to the supreme court advisory committee in 1993, which, after extensive study and drafting, recommended a new set of rules to the supreme court in May of 1996, where they abide to this day. *See* William V. Dorsaneo, III, *Revision and Recodification of the Texas Rules of Civil Procedure Concerning the Jury Charge,* 41 S. Tex. L. Rev. 675, 676 (2000).

separately and, instead, predicating them on a negative answer for all defendants in response to the wrongful death liability question.

## D. Evidence of Nonfatal Injury to Pat by Dr. Haroona

The Cunninghams argue that they were entitled to their requested separate submission of survival damages by Questions 8, 9, and 10 because some evidence exists in the record that negligence of Dr. Haroona caused nonfatal injuries to Pat during the time that he served as on-call physician for Dr. Ezukanma, in addition to the damages for wrongful death found to have been caused by the negligence of other defendants.

Dr. Haroona responds that the Cunninghams' pleadings and evidence did not support separate liability questions for a separate and distinct injury in connection with Dr. Haroona's care and treatment of Pat because there was no evidence of any separate or distinct nonfatal injury caused by Dr. Haroona. He thus argues that the trial court's charge as submitted was correct because it allowed the jury to consider the acts or omissions of all involved and to award the Cunninghams their survival damages in response to Question 4, which allowed the jury to find damages for Pat's pain and mental anguish experienced as a result of the "injuries in question *before her death.*" [Emphasis added.]

Counsel for the Cunninghams acknowledged during oral argument that the damages of $1.43 million found by the jury in answer to Question 4 were, indeed, their survival action damages for Pat's injuries suffered before her death. A comparison between Questions 4 and 10 reveals that both questions are

37

identical. Both asked the jury to find what sum of money, if any, would have compensated Pat for the conscious pain and mental suffering experienced by Pat "as a result of the injuries in question before her death." Question 4 was not limited to fatal injuries, nor was Question 10 limited to nonfatal injuries. As worded, absent the conditioning instruction, the jury could have found the same survival damages in answer to both Questions 4 and 10.[18] Indeed, the record reflects that the Cunninghams' counsel argued to the jury in closing that, if it reached Question 10, "the same answers" it gave to Question 4 "would be appropriate."

Dr. Haroona's contention that the Cunninghams were awarded their survival damages in Question 4 is, in effect, an invocation of the one-satisfaction rule. The one-satisfaction rule prohibits a plaintiff from recovering twice for a single injury. *Casteel,* 22 S.W.3d at 390; *Vanasek v. Underkofler*, 50 S.W.3d 1, 10 (Tex. App.—Dallas 1999), *rev'd on other grounds*, 53 S.W.3d 343 (Tex. 2001). The rule applies when all defendants commit the same act or technically different acts that cause a single injury. *See, e.g., Allan v. Nersesova*, 307 S.W.3d 564, 574 (Tex. App.—Dallas 2010, no pet.) (citing *Casteel*, 22 S.W.3d at 390; and *Vanasek*, 50 S.W.3d at 10); *see also Weeks Marine, Inc. v. Garza*, No. 10-0435, 2012 WL 2361721, at *3 (Tex. June 22, 2012) ("The basis of a double

---

[18]Defendants asked the court to limit the damages inquired about in Question 8 for pain and mental anguish to nonfatal injuries, that is, those caused by injury "not resulting in her death," which the court refused without explanation.

recovery challenge is that a party recovered twice for one injury."). The fact that more than one defendant may have caused the injury or that there may be more than one theory of liability does not modify this rule. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 8 (Tex. 1991); *see Galle, Inc. v. Pool*, 262 S.W.3d 564, 573–74 (Tex. App.—Austin 2008, pet. denied). Whether the rule applies is determined not by the cause of action but by the injury. *Allan*, 307 S.W.3d at 574.

Here, while there was potentially a difference between acts that caused injury resulting in Pat's death and acts that caused injury that did not cause or contribute to her death, we agree with Dr. Haroona that the Cunninghams were entitled to only one satisfaction for their survival damages and that any finding in response to Question 10 would have given them a double recovery for the same injuries for which the jury found survival damages in answer to Question 4.[19] A review of the Cunninghams' causation evidence confirms this conclusion.

---

[19]The Cunninghams contend that there is a *Casteel* problem, quoting from the trial judge's comments regarding his concerns about *Casteel* as to why he originally thought that their two requested sets of questions should be separately submitted. *See Casteel*, 22 S.W.3d at 388–89. But they have not argued that the trial court's subsequent conditional submission of the two separate theories presents *Casteel* error in erroneously combining two separate theories of liability, one of which is for a valid claim and the other for a legally or factually invalid claim. Rather, their position is the reverse: that both theories—their wrongful death and survival actions—were valid but were submitted in such a manner that the jury was prevented from reaching the questions regarding their survival act claim as to Dr. Haroona. We need not decide in this case whether conditional submission of two valid claims may constitute error to which *Casteel* should be extended because we hold that the Cunninghams were fully compensated for

The Cunninghams contend that there is evidence of additional injury caused by negligence of Dr. Haroona that did not result in Pat's death. They first point to Dr. Haroona's order for the BiPAP mask and cite testimony that a BiPAP fit more tightly than a venti-mask, was contraindicated with Pat's TN, and caused Pat to suffer pain. But although Nurse Koch recalled that Pat yelled that the mask was too tight and that she could not breathe, Nurse Koch testified that Pat never complained of pain from the mask. Although Dr. Varon's opinion was that someone with TN would more likely than not have suffered pain from the BiPAP mask, he thought that anyone, even without TN, would have pain from such a mask. And he admitted that he had no evidence from the medical records that Pat ever complained of pain from the BiPAP mask. We have likewise found no evidence in the record that Pat suffered pain from the BiPAP mask that would constitute evidence of nonfatal injury.

The Cunninghams also point to Dr. Haroona's counter-order to remove that mask and place Pat back on the previous mask, which she had already repeatedly removed, arguing that she necessarily suffered pain from the previous mask. But, again, they have cited us no evidence that the prior mask—whether it was the venti-mask or the nonrebreather mask—ever caused Pat pain, nor have

their survival damages and were not entitled to submission of their additional questions for damages for nonfatal injuries as to Dr. Haroona.

they argued that placing Pat on either the BiPAP or the prior mask caused her any other nonfatal injury.[20]

The Cunninghams also argue that Dr. Haroona failed to order Pat intubated "stat" at 3:10 a.m. and that, during the time before she was intubated at 3:30 a.m., Pat suffered hyperventilation, dyspnea (air hunger), suffocation and choking-like sensations, extreme effort to breathe, basically lost consciousness and sphincter control, and had severely-low oxygen levels. But we have scoured the record and cannot agree that there is evidence that any of those acts and omissions in placing the BiPAP in the first instance, ordering the BiPAP removed and Pat placed back on the venti-mask, or failing to order Pat intubated sooner caused any separate or distinct *nonfatal injury* to Pat. To the contrary, Dr. Varon's descriptions of Pat's extreme efforts to breathe and his characterization of her suffering as air hunger and choking sensations concerned harm caused, not by Dr. Haroona, but by Nurse Koch in failing to recognize the severity of illness, allowing Pat to have progressive episodes of desaturation that were dangerously low, failing to notify Dr. Haroona of these events, and failing to "bag" her during the process of intubating her and hooking up the respirator after Dr. Haroona had ordered intubation. There was no evidence that Dr. Haroona was

---

[20]The Cunninghams also complain of Dr. Haroona's order for Vistaril, an anti-anxiety medication that Dr. Varon testified was contraindicated for a patient with respiratory problems. But Dr. Varon provided no expert opinion as to how that medication might have reacted to depress Pat's breathing or to reduce her ability to oxygenate.

in any way responsible for those matters, either of which he had not been advised or as to what was done in carrying out his intubation order.

Moreover, this testimony is not evidence of nonfatal injury. To the contrary, Dr. Varon testified that the failures by Nurse Koch, as well as those of the respiratory therapist, and Dr. Ezukanma—including his failure to inform Dr. Haroona of Pat's condition on the evening of June 2—resulted in the series of "consecutive and repetitive instances" of low oxygen, were part of the "continuum of [ ] disease" toward a coma-like state, and were part of the "chain of causation" that caused her death.

Dr. Naarden likened the chain of events to a "series of dominos." When asked to support the domino theory and explain what caused Pat's death, Dr. Naarden summarized his conclusions as follows:

> Well, I think that Mrs. Cunningham, who had suffered from multiple sclerosis for 20 years, but had been quite stable, came into the hospital because of such severe facial pain. She was unable to eat or drink, and she suffered from malnutrition at the time of admission.
>
> She -- the bridge between malnutrition and infection is immunoincompetence, which is a complication of malnutrition. She then developed pneumonia, she developed respiratory failure at the same time that she developed the pneumonia.
>
> Malnutrition also can cause what's called bacterial translocation, which means that the normal bacteria that lives in our small intestine and large intestine can penetrate into the tissue and get into the circulation, so there are two sources of sepsis, that is infection in the blood.
>
> This, then, I think, led -- there were a series of events that occurred, including hypoxia because of the respiratory failure, she

42

developed a drug-induced hypotension, she developed strokes, and at the same time, as is common in many patients who are in the stress of an acute medical problem, developed a coagulopathy.

Now, that coagulopathy, that is a disturbance in the coagulation properties of the blood, can be mild and subclinical or it can be abrupt and extremely severe. Whichever the -- and in this particular situation I believe it was the combination of the hypoxia, the hypotension problem that resulted in strokes. In addition, the coagulation problem and the infection led to multiorgan failure, and that subsequently led to her death.

Dr. Naarden acknowledged that nosocomial-acquired pneumonia occurs in all hospitals, that he does not know what causes DIC, and that what caused Pat's death was a very medically complex situation. He could not extract one issue and say that Pat might have had a different outcome if it had or had not been done. While Dr. Naarden opined that Pat suffered a hypoxic event in the early morning hours of June 3, he testified that he could not "tease away" the "hypoxic event" from the fact pattern and give an opinion as to whether she still would have suffered a cerebral infarct or the complications of sepsis or DIC.

Finally, neither Dr. Naarden nor Dr. Varon provided any testimony that any negligence of Dr. Haroona was a proximate cause either of injuries resulting in Pat's death or of nonfatal injuries to Pat before her death. *See Chesser v. LifeCare Mgmt. Servs., L.L.C.*, 356 S.W.3d 613, 622 (Tex. App.—Fort Worth 2011, pet. filed) ("[E]xpert testimony based on reasonable medical probability is required to establish proximate cause.") (citing *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010); and *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995)).

43

Viewed in light of the standard of review as articulated in *Elbaor*, we conclude that the evidence of brain injury from the episodes of hypoxia as well as the evidence of Pat's breathing difficulties, air hunger, and choking sensations constituted evidence of pain and suffering that the jury could only reasonably have found to have resulted from injuries that caused or contributed to Pat's death. The Cunninghams are thus barred from recovery of any damages the jury may have found in response to the conditioned Question 10 because any such damages would necessarily have been included in the award of damages in response to Question 4. The Cunninghams' experts could not disengage or separate the acts of the various defendants in the chain of causation leading to Pat's death, and neither testified that any act or omission by Dr. Haroona proximately caused nonfatal injury to Pat before her death. Whether viewed as a question of double recovery in violation of the one-satisfaction rule or a question of legally insufficient evidence to support the submission of survival action damages, the Cunninghams were not entitled to the submission of Questions 8, 9, and 10 for separate and distinct, nonfatal injuries because the evidence showed only a continuum of causation leading to death. *See Star Enter. v. Marze,* 61 S.W.3d 449, 457–58 (Tex. App.—San Antonio 2001, pet. denied) (holding trial court did not fail to distinguish between wrongful death and survival claim in refusing to submit requested question asking if fall or injuries sustained in fall caused death where single theory of case was premises liability and controlling issue of whether defendant caused "occurrence" and death of

44

individual were functionally identical under pleadings and evidence); *Pack v. Crossroads, Inc.*, 53 S.W.3d 492, 516 (Tex. App.—Fort Worth 2001, pet. denied) (holding trial court did not err by refusing to submit issue on survival act damages for injuries that did not cause death where same allegations gave rise to both survival and wrongful death claims and evidence did not support verdict on survival claim*); see also Andrews v. Rodeo Square Apts.*, No. 02-05-00548-CV, 2006 WL 2042507, at *4 n.3 (Tex. App.—Houston [1st Dist.] July 20, 2006, no pet.) (mem. op.) (holding summary judgment properly granted as to both wrongful death and survival actions because theory was negligence based on same facts for both and defendant conclusively established no duty, applicable to both actions); *Kehler v. Eudaly,* 933 S.W.2d 321, 327, 332 (Tex. App.—Fort Worth 1996, writ denied) (same). *See generally Allan*, 307 S.W.3d at 574 ("The one-satisfaction rule prohibits a plaintiff from recovering twice for a single injury.") (citing *Casteel,* 22 S.W.3d at 390; and *Vanasek*, 50 S.W.3d at 10).

We overrule the Cunninghams' sole issue.

## VI. Conclusion

Having overruled the Cunninghams' sole issue, we affirm the trial court's judgment.

ANNE GARDNER<br>
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

LIVINGSTON, C.J., filed a concurring and dissenting opinion.

DAUPHINOT, J., concurs without opinion.

DELIVERED:  August 23, 2012



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-07-00231-CV

ROBERT GENE CUNNINGHAM,                                    APPELLANTS
INDIVIDUALLY AND AS
REPRESENTATIVE OF THE
ESTATE OF PATRICIA MAUDINE
CUNNINGHAM, DECEASED,
ROBIN LEE CUNNINGHAM
BISHOP, AND TRACY JEANNE
CUNNINGHAM LANG

V.

LADI O.M. HAROONA, M.D.                                    APPELLEE

----------

### FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

----------

## CONCURRING AND DISSENTING OPINION

----------

I respectfully join in the result reached by the majority opinion, and I also

join the majority opinion's conclusions that charge error was preserved and that

the one-satisfaction rule imposes an impediment to showing harm from charge error committed by the trial court sufficient to require a new trial.

However, I cannot agree with the majority's conclusion that appellants were not *entitled* to submission of the issue of Mrs. Cunningham's pre-death, nonfatal injury because of insufficient evidence of nonfatal injury, i.e., pain and suffering while alive. The conclusion asserted by the majority—that neither Dr. Naarden nor Dr. Varon "provided any testimony that any negligence of Dr. Haroona was a proximate cause . . . of nonfatal injuries to [Mrs. Cunningham] before her death"—is contrary to its own recitation of evidence of "pain and suffering" endured by Mrs. Cunningham before she died, e.g., that "brain injury from the episodes of hypoxia as well as . . . breathing difficulties, air hunger, and choking sensations constituted evidence of pain and suffering." There is other testimony and evidence of pain and suffering, examples of which I highlight.[1]

Dr. Haroona knew Mrs. Cunningham was breathing fast, was agitated, and was removing her oxygen mask. He knew that patients with trigeminal neuralgia could not tolerate a BiPAP mask "if [in his words] the pain is active at that point in time." He also knew Mrs. Cunningham was in hypoxic respiratory failure on June 2 when he received the first call from the ICU nurse, Nurse Koch, at 11:00 p.m. Nurse Koch's note at 12:45 on June 3 notes, "The patient pulled off the BIPAP

---

[1]While there are multiple examples of pain and suffering, I will highlight only a few so that this opinion may be released within a few weeks of receiving the majority opinion.

2

despite restraints. Agitated, pulling at restraint, yelling, 'I don't want that on. It's too tight. I can't breathe.' Sats down to 52. Color dusky to blue. Respiration 50's. Heart rate 140's." By 1:00 a.m. she was incontinent, aphasic, and could not talk. And finally, when Mrs. Cunningham's husband was called and arrived around 3:10 a.m. the morning of June 3, he testified that she was blue and barely breathing with only four to five respirations per minute.

Dr. Varon, one of appellants' experts and also a board certified physician in internal medicine, pulmonary medicine, critical care medicine, and geriatric medicine, compared Mrs. Cunningham's dyspnea, or air hunger, to someone being choked: "[J]ust imagine if somebody is choking you with their hands . . . ." "She is begging for air." "[S]he is really hungry for air." "[S]he is confused. She is not a hundred percent oriented . . . ." He believed she had a hypoxic brain injury in the early morning hours of June 3 and described the effects of a hypoxic brain injury such as brain swelling and sepsis (which likely caused her DIC—a blood clotting disorder—that probably occurred between June 3 and June 5). He based this upon her clinical appearance; she was bleeding from every orifice and had bruising.

Furthermore, Dr. Varon observed that Mrs. Cunningham's admitting problem was "severe pain as it pertains to the trigeminal neuralgia," which included her inability to eat the week before admittance. On admission, Mrs. Cunningham identified the pain as a "10" on the scale of 1–10. She had been on pain medication up until June 2.

3

Dr. Varon also said, "[I]n somebody that has trigeminal neuralgia, more likely than not they are going to have pain as you put that pressure [from a BiPAP on] . . . ." This was confirmed by one of Mrs. Cunningham's respiratory therapists, Michael Hicks, who stated that a patient who cannot tolerate a facial mask would unlikely be able to tolerate a BiPAP mask because it fits so tight. Additionally, Nurse Koch testified that a patient will remove any breathing mask if it is painful or uncomfortable. Mrs. Cunningham's daughter, Robin, also testified that when her mother was having an episode with her trigeminal neuralgia, she would grab her jaw or her mouth, and Robin could tell she was in a lot of pain.

One of the defense experts, Dr. Lennard Nadalo, testified that Mrs. Cunningham's hypoxic brain injury could have caused her unresponsiveness. At that point, her body was so swollen that her skin began to split open on her arms, and she had gangrene in all of her extremities; her skin was black from the knees down. Dr. Varon testified that Mrs. Cunningham had been "tachypneic, or breathing fast, had been hyperventilating for an extensive period of time," and was "very short of breath." Dr. Varon also testified that had she received proper food or nutrition, such as enteral feeding, as late as the evening of June 2, she would have survived or more successfully battled the pneumonia she developed. According to him, Mrs. Cunningham was eating an ineffective portion of food to maintain her respiratory function. Additionally, the thromboembolic injury (stroke) she suffered on or about June 4 caused mental changes, changes in communication capacity, decreased consciousness, and agitation. Dr. Varon

4

related all these pre-death conditions to the lack of nutrition, including the bacterial translocation and multisystem organ failure.

Furthermore, Nurse Koch testified that arterial sticks to test the blood gases are very painful, and Mrs. Cunningham had several of these tests, two during Koch's June 2–3 shift.

Despite this and other evidence, the majority concludes that the source of pre-death pain and suffering cannot be the same as those injuries that cause death—that they are mutually exclusive. As a result, the majority opinion eviscerates the statutorily-created cause of action for survival damages. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 71.001–.004, .021 (West 2008). This we cannot and should not do.

Survival statutes permit a decedent's heirs to recover for the personal injuries the decedent suffered pre-death. *Id.* § 71.021; *THI of Tex. at Lubbock I, LLC v. Perea*, 329 S.W.3d 548, 567 (Tex. App.—Amarillo 2010, pet. denied). "The difference between the [survival and wrongful death] statutes is the nature of the damages that may be recovered and who may collect them. The purpose of the Texas Survival Statute is 'to continue a decedent's cause of action beyond death to redress . . . decedent's injuries that occurred before he died.'" *THI*, 329 S.W.3d at 568.

We also know that conscious pain and suffering may be established by circumstantial evidence, and here there was both expert testimony as well as lay testimony—direct evidence from witnesses who observed Mrs. Cunningham's

5

pain and suffering during appellee's care. *See Mariner Health Care of Nashville, Inc. v. Robins*, 321 S.W.3d 193, 211 (Tex. App.—Houston [1st Dist.] 2010, no pet.). "Once the existence of some pain and suffering has been established . . . there is no objective way to measure the adequacy of the amount awarded as compensation." *Id.* Therefore, I would have concluded that there was sufficient evidence of pain and suffering to submit the question on survival damages and that the trial court erred by failing to submit the question.

However, because appellants here concede that damages awarded by the jury already included damages for pain and suffering, there is no harm and therefore no right to a new trial. *See* Tex. R. App. P. 44.1(a) (stating omission of instruction is harmful and reversible only if it caused rendition of an improper judgment); *see also THI*, 329 S.W.3d at 567–68. Therefore, I agree there is no basis to grant a new trial.

TERRIE LIVINGSTON
CHIEF JUSTICE

DELIVERED: August 23, 2012