PERSEUS, INC. d/b/a Hippodrome,
Appellant,

v.

Debbie CANODY, individually and as
representative of the Estate of Alisha
Martin, and Gloria Tijerina and Larry
Tijerina, individually and as represen-
tatives of the Estate of Ruben Tijeri-
na, deceased, Appellees.

No. 04–97–00760–CV.

Court of Appeals of Texas,
San Antonio.

March 31, 1999.

Rehearing Overruled May 25, 1999.

Thomas F. Nye, Linda C. Breck, Brin & Brin, P.C., Corpus Christi, for Appellant.

Thomas C. Hall, Hall & Bates, L.L.P., San Antonio, Paul Anderson, Jr., James B.

Lewis, Glover, Anderson, Chandler & Uzick, L.L.P., Peter M. Kelly, Miller Criaco Kelly, Houston, for Appellee.

Before ALMA L. LÓPEZ, Justice, CATHERINE STONE, Justice and SARAH B. DUNCAN, Justice.

## OPINION

CATHERINE STONE, Justice.

This appeal from a jury's verdict in a wrongful death case raises issues regarding the Dram Shop Act and the statutory "safe harbor" defense which protects purveyors of alcohol who take certain precautions to ensure that intoxicated individuals are not served.

Ruben Tijerina and his fiancee, Alisha M. Martin, were killed by a drunk driver as they walked along the shoulder of a road in San Antonio.[2] The surviving parents of Tijerina and Martin sued Sam Selman, the intoxicated driver, and Perseus, Inc., the owner and operator of the Hippodrome—the night club where Selman had been drinking prior to the accident. The jury found that Selman was 65 percent responsible for the deaths, and that Perseus was 35 percent responsible. A defensive issue regarding the "safe harbor" provision specified in the Texas Alcohol and Beverage Code was rejected by the jury. Damages in excess of two million dollars were awarded to the surviving family members. On appeal we are concerned with the liability and defenses of Perseus only. Perseus contends the evidence is legally and factually insufficient to support the jury's finding that it was negligent under TEX. ALCO. BEV.CODE ANN. § 2.02 (Vernon 1995) (the Dram Shop Act). Perseus also claims that it established its right to its affirmative defense under TEX. ALCO. BEV.CODE ANN. § 106.14(a) (Vernon 1995) (the "safe harbor" defense). Because the evidence is legally and factually sufficient to support the liability finding, and be-

cause Perseus failed to establish its entitlement to the protections of the "safe harbor" defense, we affirm the judgment of the trial court.

### FACTUAL BACKGROUND

On the evening of March 20, 1994, Sam Selman arrived at the Hippodrome night club for an evening of socializing with friends. Testimony revealed that Selman appeared intoxicated when he arrived, that he continued to drink for the several hours he was at the club, and that he appeared intoxicated when he departed the club shortly after midnight. In fact, about an hour before he left the club, one of his companions attempted to give him twenty dollars to take a cab home. Despite his condition, Selman did not take a taxi; instead, he drove his own vehicle home. The fatal accident occurred during his drive home.

### NEGLIGENCE AND PROXIMATE CAUSE

**The Dram Shop Act**

Under Texas law, a provider of alcoholic beverages can be held liable for damages sustained by innocent third parties resulting from a patron's intoxication. As specified in the Dram Shop Act:

(b) Providing, selling, or serving an alcoholic beverage may be made the basis of a statutory cause of action ... upon proof that:

(1) at the time the provision occurred it was apparent to the provider that the individual being sold, served, or provided with an alcoholic beverage was obviously intoxicated to the extent that he presented a clear danger to himself and others; and

(2) the intoxication of the recipient of the alcoholic beverage was a proximate cause of the damages suffered.

TEX. ALCO. BEV.CODE ANN. § 2.02 (Vernon 1995).

---

**2.** Martin was four months pregnant with the couple's child at the time of her death.

## The Jury Question

This language from the Dram Shop Act was tracked in question two of the court's charge, which inquired as follows:

As to Perseus, Inc., "Negligence" means providing, under authority of a license, an alcoholic beverage to Sam Selman III when it is apparent to the provider that the recipient is obviously intoxicated to the extent that he presents a clear danger to himself and others.

You are instructed that negligence, if any, as to Perseus, Inc. was a proximate cause of the occurrence in question if Selman's intoxication was a proximate cause of the occurrence in question.

Did the negligence, if any, of those named below proximately cause the occurrence made the basis of this suit?

In response to this question the jury found that both Perseus and Selman were negligent. The jury attributed 35 percent negligence to Perseus and 65 percent to Selman.

## The Standard of Review

On appeal Perseus challenges the legal and factual sufficiency of the evidence to support the jury's answer to question two. Specifically, Perseus claims there is no evidence, or insufficient evidence, to establish that it was apparent to Hippodrome employees when they provided alcoholic beverages to Selman that Selman was obviously intoxicated and that he presented a clear danger to himself and others.

In challenging the liability finding, Perseus is attacking the evidentiary support for an issue on which it did not have the burden of proof. Under such circumstances Perseus must demonstrate on appeal that there is no evidence or merely a scintilla of evidence to support the finding. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). In considering a "no evidence" or legal sufficiency point, we consider only the evidence and reasonable inferences favorable to the decision of the trier of fact and disregard all evidence and

inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex. 1988); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). When we consider a factual sufficiency point, we assess all the evidence and reverse for a new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). In conducting our review, we are mindful that it is for the jury, not this court, to judge the credibility of the evidence, assign the weight to be given to testimony, and resolve conflicts or inconsistencies. *Corpus Christi Teachers Credit Union v. Hernandez,* 814 S.W.2d 195, 197 (Tex.App.—San Antonio 1991, no writ).

## Evidentiary Review

Sam Selman had no recollection of his evening at the Hippodrome, so he was of no assistance in recreating the events of the night. Two of his companions, however, testified that he arrived at the Hippodrome intoxicated and drank throughout the night. Brian Murphy testified that when Selman arrived at the Hippodrome at approximately 9:45 in the evening, it appeared that he had already been drinking. During the course of the evening Murphy saw Selman drink at least seven or eight malt liquors. Murphy testified that another friend, Jake, was buying drinks for Selman. Murphy was not sure if Selman also drank shots when he was at the bar with Jake buying drinks. Murphy indicated that throughout the evening there was an on-going discussion or argument with Selman about his ability to drive home. As described by Murphy, "We argued all the way to the door." Murphy attempted to give Selman $20 to take a taxi home, but Selman would not accept the money. Murphy described Selman's intoxicated condition as "obvious to anyone there," noting that Selman stumbled on the dance floor, was generally unsteady on

his feet, slurred his speech, and had blood-shot eyes. Another of Selman's friends, Larry Schnepp, testified to essentially the same facts as Murphy. Schnepp, who does not drink at all, described both Selman and Jake as "heavy drinkers." He saw Selman and Jake order two drinks from the waitress, and he thought that Selman paid the waitress himself for at least one drink. Selman and Jake ordered a third drink at the bar, and Schnepp thought that Selman and Jake were also "doing shots" at the bar. Schnepp stated that he could tell that Selman was drunk because of the way he was walking, slurring his speech, and acting weird. He did state, however, that if he had never met Selman before and saw him on the evening in question at the Hippodrome, he might not have thought it was obvious that Selman had consumed too much alcohol. Schnepp was also concerned about Selman's ability to drive because there was no doubt in his mind that Selman was too drunk to drive.

Dr. Oscar Dorsey, majority shareholder of Perseus, testified that if Selman exhibited the kind of behavior described by Murphy and Schnepp, then Perseus employees should have seen the behavior and stopped providing drinks. In Dorsey's view, the failure to do so would be negligence, or as he described it, someone was not doing their job.

In contrast to the testimony of Murphy and Schnepp, Perseus relied upon the testimony of several other witnesses who indicated that it was possible that no Hippodrome employee ever saw Selman act intoxicated. Terry Reichel, a manager at the Hippodrome, testified that he never saw an employee serve alcohol to an obviously intoxicated patron.[3] Similarly, Roy Kirkpatrick, a consultant and TABC trainer, testified that he had seen no evidence that Selman in any way revealed signs of intoxication in front of a Hippodrome employee. Specifically, Kirkpatrick stated that he saw no evidence that Selman was unsteady on his feet, fell from a bar stool, or had difficulty making change. Perseus relies on the testimony of these witnesses to argue that appellees failed to establish a violation of the Dram Shop Act because there is no direct testimony that a Hippodrome employee actually observed the classic signs of intoxication referred to by Murphy and Schnepp. We reject Perseus' argument on several grounds.

■ First, while the statute imposes liability when it is "apparent to the provider" a patron is obviously intoxicated, we do not believe the statute requires evidence that the provider actually witnessed the intoxicated behavior. We give statutory language its plain and ordinary meaning unless the statute provides otherwise. See TEX. GOVT.CODE ANN. § 312.002(a) (Vernon 1998). As noted by appellees, "apparent" means "That which is obvious, evident, or manifest; what appears, or has been made manifest. That which appears to the eye or mind; open to view; plain; patent." Black's Law Dictionary 88 (5th ed.1979). It is not the actual observation of conduct that makes the conduct "apparent." Rather, conduct is apparent when it is visible, evident, and easily observed. Were we to construe the statutory "apparent to the provider" requirement as Perseus requests, then a provider of alcohol could always escape liability by merely turning a blind eye to signs of intoxication that are plain, manifest, and open to view. Surely this is not what the Legislature intended when it enacted legislation to hold providers responsible when they serve obviously intoxicated individuals.

■■ Second, even if we assume, as Perseus argues, that the Dram Shop Act has completely eliminated the common law

---

**3.** It does not appear from the deposition excerpts introduced at trial that Reichel was speaking of the specific night in question. In fact, from the testimony introduced at trial, it is not even clear that Reichel was employed by the Hippodrome at the time of the fatal accident.

standard of imposing liability when a provider "knows or should know" a patron is intoxicated, that does not mean that the "apparent to the provider" statutory standard requires a subjective intent on the part of the provider to continue serving an intoxicated patron. *Compare El Chico Corp. v. Poole,* 732 S.W.2d 306, 314 (Tex. 1987) (alcoholic beverage licensee is negligent when serving alcoholic beverages to patron who licensee knows or should know is intoxicated) *with* TEX. ALCO. BEV.CODE ANN. § 2.02 (b)(1) (Vernon 1995) (alcoholic beverage provider is liable when serving alcoholic beverages to a patron when it was apparent to provider that individual was obviously intoxicated). Even if we view the statutory standard as a subjective standard, it does not supercede a jury's right to weigh evidence, assess the credibility of witnesses, and draw reasonable inferences from the evidence. *See Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex.1997); *Texas Employers' Ins. Ass'n v. Jackson,* 719 S.W.2d 245, 249–50 (Tex.App.—El Paso 1986, writ ref'd n.r.e.). Likewise, a subjective standard does not eliminate the rule that a disputed fact may be proved by circumstantial evidence. *See Blount v. Bordens, Inc.,* 910 S.W.2d 931, 933 (Tex.1995); *Prudential Ins. Co. of Am. v. Krayer,* 366 S.W.2d 779, 780 (Tex.1963).

■ Here, the record contains evidence from which the jury could infer that Selman's intoxication was "apparent to the provider." As noted, the jury learned that Selman drank seven or eight malt liquors in the bar, stumbled on the dance floor, was generally unsteady on his feet, slurred his speech, and had bloodshot eyes. Indeed, Murphy indicated that Selman's intoxicated state was "obvious to anyone there." Moreover, although Selman's friend Jake had purchased most of Selman's drinks, testimony places Selman at the bar in an intoxicated state during some of the purchases. Thus, from this testimony, the jury could infer that Selman's intoxicated state was "visible, evident, and easily observed" by the provider. Finding legally and factually sufficient evidence to support the jury's answer to Question 2, we overrule Perseus' second issue.

## THE SAFE HARBOR DEFENSE

■ In its first claim of error, Perseus contends that it proved its affirmative defense under TEX. ALCO. BEV.CODE ANN. § 106.14(a) (Vernon 1995) as a matter of law. This statutory provision, also known as the "safe harbor" defense, provides as follows:

(a) For purposes of this chapter and any other provision of this code relating to the sales, service, dispensing, or delivery of alcoholic beverages to a minor or an intoxicated person or the consumption of alcoholic beverages by a minor or intoxicated person, the actions of an employee shall not be attributable to the employer if:

(1) the employer requires its employees to attend a commission approved seller training program;

(2) the employee has actually attended such a training program; and

(3) the employer has not directly or indirectly encouraged the employee to violate such law.

*Id.* If all three elements of this affirmative defense are established, a plaintiff's recovery is barred. *Pena v. Neal,* 901 S.W.2d 663, 667 (Tex.App.—San Antonio 1995, writ denied) This defensive issue was submitted to the jury, which found that Perseus failed to comply with the statute.[4]

---

**4.** We decline the invitation of appellee Debbie Canody to hold that the safe harbor defense does not apply to a civil action brought under TEX. ALCO. BEV.CODE ANN. § 2.03 (Vernon 1995). By its plain terms, section 106.14 applies to any provision of the Code relating to the sales or service of alcoholic beverages to an intoxicated person. Additionally, this court has previously recognized the application of section 106.14 in a wrongful death case similar to the case at bar. *Pena,* 901 S.W.2d at 667.

In reviewing the jury's rejection of this affirmative defense, we must first examine the record for evidence supporting the jury's answer. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). Only if there no evidence to support the jury's answer will we review the entire record to determine if the contrary position is established as a matter of law. *Victoria Bank & Trust Co. v, Brady,* 811 S.W.2d 931, 940 (Tex.1991).

**Required Attendance At Seller Training**

On appeal, there seems to be no dispute that Perseus, at least as a matter of general policy, required all of its employees to attend TABC approved seller training. Appellees produced no evidence to counter Dr. Dorsey's testimony that all employees were required to be TABC certified. The dispute is whether Perseus proved that all employees on duty on the night in question were in fact TABC certified. In keeping with the appropriate standard of review, we will review the evidence regarding the general policy of required seller training attendance only if we determine that there is no evidence to support the jury's decision on one of the other elements of the safe harbor defense. *See Sterner,* 767 S.W.2d at 690.

**Actual Attendance At Seller Training**

Appellees contend Perseus failed to establish that all employees working at the Hippodrome on the night of the accident were in fact TABC certified. The testimony of Evea Haass, daughter of Dr. Dorsey and general manager of the company hired to manage the Hippodrome, was offered by Perseus to establish that all employees on duty on the night of the accident were TABC certified. Appellees offered testimony from her two pre-trial depositions in an effort to impeach her

trial testimony. According to her deposition testimony, she was living in New York City from March to August of 1994.[5] Haass further testified that her sister, Carroll Dorsey, took over as general manager while she was in New York.[6] Although she was the general manager, Haass testified that day-to-day operations at the Hippodrome were handled by other managers, and admitted that she could not state which employees were working at the club on a specific date, such as the date of the accident. In fact, Haass could not say who could verify the complete roster of employees on duty on the night in question. Haass reviewed the employee time cards and records for persons she believed were employed at the Hippodrome on the night in question. These records, which revealed TABC certificates for each employee, were retrieved from a file by her secretary. In deposition testimony Haass could not verify that the records were made and maintained in the ordinary course of business, although at trial she testified that the records were maintained by the Hippodrome under the custody of Hippodrome employees. The records were admitted over objection as business records. Appellees note that Haass was unable to state unequivocally that the records she had covered all the persons on duty on March 20–21. Stating that "anything was possible," Haass admitted that there could have been other employees on duty that night whose records she did not have. Haass further admitted it was a possibility that a non-certified employee had served alcoholic beverages at the Hippodrome. Appellees further note that Dr. Dorsey and Haass testified that they were locked out of the Hippodrome in a dispute with the landlord and when they were later allowed access to the club's property, some records were lost. There was also at

---

**5.** At trial Haass testified that she was mistaken in her deposition testimony, and that she left for New York in May 1994.

**6.** Carroll testified that she was the promotions director for the Hippodrome. She was unaware that her sister had ever made her the general manager, and she denied assuming any of the duties of general manager during her sister's absence. She specifically denied checking to assure that TABC regulations or guidelines were followed.

least one break in where the records were maintained.

Haass' testimony does not establish as a matter of law that all employees on duty on the night in question were in fact TABC certified. While this court may have decided this factual dispute differently, we do not sit as thirteenth jurors, and it is the jury's function, not this court's, to resolve the discrepancies in the testimony. *See Venetoulias v. O'Brien,* 909 S.W.2d 236, 240 (Tex.App.—Houston [14th Dist.] 1995, writ dism'd by agr.). Based upon the evidence presented, the jury could have reasonably inferred that not all Hippodrome employees were certified, and could have rejected the safe harbor defense on that basis.

### Encouragement To Violate The Law

■ Appellees contend the written policies of the Hippodrome reveal inconsistencies that allowed the jury to determine the Hippodrome indirectly encouraged violation of applicable liquor laws. For example, the section of the policies specifying grounds for employee termination lists serving alcohol to a minor as grounds for termination, but fails to include serving alcohol to an intoxicated person.[7] Another section of the policies entitled "Grounds for Immediate Termination," makes no mention of serving either minors or intoxicated persons. In a separate section devoted to "Intoxicated Customers," the policies advise that employees cannot allow customers to become intoxicated at the club, and state that any employee "serving a drink to an intoxicated customer is subject to immediate dismissal." However, in listing specific steps that employees can take to prevent customers from becoming intoxicated, the policies state that "[i]f a customer shows signs of becoming intoxicated serve them 'light' drinks or not at all." This policy alone provided the jury with a basis to determine that the Hippo-

drome indirectly encouraged its employees to serve alcohol, albeit watered-down alcohol, to intoxicated persons.

Dr. Dorsey testified that policies were irrelevant in the absence of enforcement. He admitted that if Selman appeared as intoxicated as his companions testified he was, then his employees should have "spotted it" and followed the policies. Dr. Jim Calder, an industrial security expert, testified that the Hippodrome failed to enforce its written policies when its employees allowed Selman to enter the club in an intoxicated condition, failed to monitor his behavior in the club, failed to stop serving him alcohol, and allowed him to leave the club in an intoxicated condition. In Dr. Calder's opinion, the failure to enforce appropriate policies evidenced an indirect encouragement to violate the law.

Encouragement to violate liquor laws by serving an intoxicated person "may take many subtle forms." *Gonzalez v. South Dallas Club,* 951 S.W.2d 72, 77 (Tex. App.—Corpus Christi 1997, no writ). Given the inconsistencies in the policies as outlined above, and the unobjected-to testimony of Dr. Calder, we hold that the jury could reasonably infer that Perseus indirectly encouraged its employees to violate the law, thereby precluding the protection of the safe harbor defense. Perseus failed to establish as a matter of law its entitlement to the safe harbor defense, and the jury's failure to find in favor of Perseus on this defense is not against the great weight and preponderance of the evidence. Accordingly, Perseus' first issue is overruled.

The judgment of the trial court is affirmed.

SARAH B. DUNCAN, concurs in the judgment only.

---

7. The policies include a summary of pertinent general liquor laws, which provides a somewhat detailed explanation of the prohibition against serving a minor. The summary is silent about the prohibition against serving intoxicated persons. Still another section on "Laws and Policies" states that it is against the law to serve intoxicated persons and that such persons should not be allowed to stay on the premises.