**Affirm and Opinion Filed April 20, 2021**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00698-CV

**BEAMERS PRIVATE CLUB D/B/A PRIVAE LOUNGE; BAVARIAN MANAGEMENT, LLC, Appellants**
**V.**
**STACEY M. JACKSON, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JERRY BROWN, JR., Appellee**

**On Appeal from the 191st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-13-13245**

## MEMORANDUM OPINION

Before Justices Osborne,[1] Pedersen, III, and Goldstein[2]
Opinion by Justice Pedersen, III

A jury found appellants Beamers Private Club d/b/a Privae Lounge and Bavarian Management, LLC liable to appellee Stacy Jackson under the Texas Dram Shop Act for the one-car accident in which Jackson's son, Jerry Brown, Jr., was killed. The jury apportioned responsibility for the accident equally between

---

[1] The Honorable David L. Bridges participated in the submission of this case; however, he did not participate in the issuance of this memorandum opinion due to his death on July 25, 2020. The Honorable Leslie Osborne has substituted for Justice Bridges in this cause. Justice Osborne has reviewed the briefs and the record before the Court.

[2] The Honorable Bonnie Goldstein succeeded the Honorable David Evans, a member of the original panel. Justice Goldstein has reviewed the briefs and the record before the Court.

appellants and the driver of the car, Joshua Brent. The trial court entered judgment against appellants for $12 million in actual damages, pre-judgment and post-judgment interest, and court costs and entered judgment against Brent for the same amount. In six issues, appellants challenge the sufficiency of the evidence supporting the verdict against them on dram shop liability, the denial of their motion to strike expert Mark Willingham, the submission of a question permitting damages to be awarded to Brown's estate, the sufficiency of the evidence supporting the award of damages to the estate, and the award of certain pre-judgment interest. We affirm the trial court's judgment.

## BACKGROUND

The facts relevant to this appeal took place during the evening of December 7 and the early morning of December 8 in 2012. Joshua Brent went to dinner with a group of teammates at Eddie V's restaurant; Brent arrived at the restaurant at approximately 9:30 p.m. and left at approximately 11:30 p.m.[3] He then returned to the apartment that he shared with his closest friend, Jerry Brown, Jr. The men had played football together in college; in 2012, Brent played for the Dallas Cowboys, and Brown was a member of the Cowboys' practice team. Testimony established that their relationship was "like brothers."

---

[3] The record establishes that Brent drank the equivalent of six alcoholic drinks while he was at the restaurant.

Brent drove himself and Brown to the Beamers club.[4] The men arrived at 12:42 a.m.,[5] and they went upstairs to the Privae Lounge, a VIP area of Beamers that featured bottle service of alcohol. The men were joined by friends and others drawn to their celebrity status, and both men drank alcohol while at Beamers. They left the club's parking lot, with Brent driving, at 2:15 a.m.

Minutes later, at 2:19 a.m., Brent's car automatically dialed 911 as it detected a loss of control. The record establishes that Brent was driving 110 miles per hour on a highway access road in Irving when he hit a dip in the road, failed to navigate a curve, and lost control of the car. The car rolled over multiple times and caught fire. Brent got out of the car and subsequently pulled Brown out. Irving emergency personnel arrived on the scene. Brown was taken to the hospital, where he died shortly before 3:00 a.m.

Brent was interviewed by Irving police officer Kevin Palms. Brent stated that he had been drinking only champagne and that he had been driving 70 miles per hour "on the exit ramp," but the accident was not near any exit ramp. Based upon Palms's assessment of Brent's condition—which included the smell of alcohol on Brent and in the car; red, glassy, bloodshot eyes; and his confusion about where he had been driving—Officer Travis Huckaby gave Brent roadside intoxication tests. Brent failed

---

[4] Brent testified that he did not have anything to drink during the time he was at the apartment waiting for Brown to get ready to go to the club.

[5] The club maintained cameras inside and outside the premises; video established relevant times with precision.

all but one. He was arrested and charged, initially with intoxication assault and later with intoxication manslaughter. Tests were performed on blood drawn from him at 3:27 a.m.; they indicated his blood alcohol content was .189, more than twice the legal limit.

Brent was tried and convicted of intoxication manslaughter. He served 180 days in the county jail.

Jackson filed this lawsuit on behalf of herself and Brown's estate. She sued appellants and Brent. In a week-long trial, jurors heard testimony from approximately a dozen witnesses, including Jackson, the police officers involved in the accident scene and subsequent investigations, the owner and a number of 2012-employees of Beamers, expert witnesses, and Brent.[6] Evidence admitted at the trial is discussed in more detail below. The jury found that appellants violated the Dram Shop Act and that they were forty-eight percent responsible for Brown's injury.[7] Jurors awarded Jackson $15 million in actual damages and Brown's estate $10 million.[8] The judgment assessed appellants' share of the damages at $12 million.

This appeal followed.

---

[6] Brent did not participate in the lawsuit other than to testify when called by appellee. He has not appealed the judgment against him.

[7] The jury also found Brent to be forty-eight percent responsible and Brown to be four percent responsible.

[8] Jackson's award included: $2.5 million for loss of companionship and society she sustained in the past, $2.5 million for loss of companionship and society in the future, $5 million for mental anguish she suffered in the past, and $5 million for mental anguish in the future. The estate's award was $10 million for Brown's pain and mental anguish.

## DRAM SHOP LIABILITY

In their first and second issues, appellants challenge the trial court's denial of their request for an instructed verdict on liability under the Dram Shop Act and the jury's finding of negligence pursuant to dram shop liability.

### The Dram Shop Act

Chapter 2 of the Texas Alcoholic Beverage Code is known as the Texas Dram Shop Act (the "Act"). *See* TEX. ALCO. BEV. CODE ANN. §§ 2.01–2.03. The Act modified common law by providing a statutory cause of action against providers[9] of alcohol under specific circumstances:

> Providing, selling, or serving an alcoholic beverage may be made the basis of a statutory cause of action under this chapter . . . upon proof that:
>
> (1) at the time the provision occurred it was apparent to the provider that the individual being sold, served, or provided with an alcoholic beverage was obviously intoxicated to the extent that he presented a clear danger to himself and others; and
>
> (2) the intoxication of the recipient of the alcoholic beverage was a proximate cause of the damages suffered.

*Id.* § 2.02(b). This statute remains the exclusive cause of action for providing an alcoholic beverage to a person 18 years of age or older. *Id.* § 2.03(c).

---

[9] The Act defines "provider" to mean "a person who sells or serves an alcoholic beverage under authority of a license or permit issued under the terms of this code or who otherwise sells an alcoholic beverage to an individual." *Id.* § 2.01(1). "'Provision' includes, but is not limited to, the sale or service of an alcoholic beverage." *Id.* § 2.01(2).

In this suit, Jackson pleaded that appellants provided alcohol to Brent when it was apparent to them that he was obviously intoxicated to the extent that he presented a clear danger to himself and others and that Brent's intoxication caused the accident by which Brown was killed. Appellants' first issue challenges the legal and factual sufficiency of the trial court's denial of their motion for an instructed verdict on this ground.

In Question No. 1, the trial court's charge asked jurors whether the negligence of appellants, if any, proximately caused Brown's injury. The charge then instructed jurors that:

> With respect to Beamers, "negligence" means providing an alcoholic beverage to a recipient when it is apparent to the provider that the recipient is obviously intoxicated to the extent that he presents a clear danger to himself and others.

In their second issue, appellants challenge the sufficiency of the evidence supporting the jury's affirmative response to this negligence question, which incorporates the Act's standard.

Our analysis of both issues, therefore, requires us to assess the legal and factual sufficiency of the evidence supporting a finding that appellants violated the Act.[10]

---

[10] Appellants make several general references to gross negligence in their briefing, but they do not brief the issue specifically. The jury made no finding on gross negligence, indicating that jurors were not unanimous in their response to Question No. 1 or Question No. 6, which concerned gross negligence itself.

## Provision of Alcohol at Privae

All witnesses who addressed the question agreed that Brent was not visibly intoxicated when he arrived at Privae. Testimony differed, however, as to how much alcohol was provided to Brent and how much he consumed while at the club.

Privae server Emerald Khan testified that Brent ordered, and she brought to his table, three bottles of champagne and—with assistance—approximately twenty glasses.[11] Khan stated that she served Brent one glass of champagne, but she did not know how many drinks he was served while at Privae. Brent testified that Khan poured the champagne and left the glasses on the table; he stated he drank two glasses.

Server Maria Fembres testified that she brought one bottle of Hennessey, a cognac, to Brent's table and poured him one glass of Hennessey and Coke. Brent testified that he then poured one glass of Hennessey himself. He believes he drank more than those two glasses, but he did not know how much more. He acknowledged that at a certain point he just kept the bottle of Hennessy to himself. He did not mean he drank the whole bottle himself, but it was his bottle to drink.

Two of Brent's teammates told the police that they had each ordered a bottle of vodka while at Beamers. A different pair of teammates reported seeing two bottles of vodka on Brent's table. Brent testified he couldn't remember whether there was

---

[11] Witness estimates of the number of people in Brent's party, which included three tables, ranged from fifteen to twenty-five persons.

vodka at the table or whether he drank any. Fembres testified that she did not see vodka bottles at Brent's table and that she did not serve a bottle of vodka to that table.

Ultimately, Brent testified that he did not know how much he drank at Privae because he could not remember specifics from the latter part of his time there. The club's video from that morning shows Brent dancing while he held up and shook two bottles and appeared to be drinking directly from them. Both servers testified that they did not see this conduct by Brent.

A neighbor and friend of Brent's, Aya Matsuda, was called by the defense. She testified that she arrived at Beamers and joined Brent at approximately 1:00 a.m., and she remained until about 1:45 a.m. She sat next to Brent all of that time except when she went to the bar to get one drink. She testified that she saw the three bottles of champagne delivered to the section, but she never saw Brent drink any champagne. She testified further that she saw no Hennessey—or any other type of alcohol—brought to the table, and she never saw Brent drink anything while she was there. She stated that dancing with bottles and drinking out of them was something Brent would not do.

Along with these fact witnesses, the record includes testimony from Dr. Sarah Kerrigan, a forensic toxicologist called by Jackson. Kerrigan testified that Brent's .189 blood alcohol level was based on a reliable test. In her opinion, Brent had to have consumed the equivalent of approximately fourteen standard drinks over the

course of the night to reach that level. Kerrigan opined that Brent would have reached his peak blood alcohol level relatively soon after his last drink given that he had been drinking throughout the evening and morning hours. She conceded that it is possible for a person to have an elevated alcohol level and to be legally intoxicated but not to show visible signs of intoxication.

## Legal Sufficiency of the Evidence

In their first issue, appellants contend that the trial court should not have denied their motion for instructed verdict on liability because there was no evidence that Brent was sold, served, or provided an alcoholic beverage when it was apparent to appellants that he was obviously intoxicated to the extent that he presented a danger to himself or others. When reviewing a no-evidence issue, we ask whether the evidence at trial—crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not—would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We consider evidence in the light most favorable to the verdict, and we indulge every reasonable inference that would support the verdict. *Id.* at 822.

Appellants' specific argument is that Brent was never visibly or obviously intoxicated while at Privae, so it could not have been apparent to appellants that he was. Appellants rely on the fact witnesses—Khan; Fembres; Matsuda; the club's doorman, Howard Jason Black; and even Brent himself, observing video from that

morning—all of whom testified that they saw Brent exhibit no signs of intoxication while he was at the club. However, the requirement that intoxication be "apparent to the provider" does not mean that the provider must actually observe such signs of intoxication; if it did, any provider of alcohol could escape liability by turning a blind eye to signs of intoxication that would otherwise be plain, manifest, and open to view. *See Perseus, Inc. v. Canody*, 995 S.W.2d 202, 206 (Tex. App.—San Antonio 1999, no pet.). Instead, fact finders can infer what was "apparent" by weighing evidence, assessing the credibility of witnesses, and drawing reasonable inferences from the evidence. *Id.* at 207. In addition, what was "apparent" may be proved by circumstantial evidence. *Id.* Fact finders are always free to disregard the testimony of witnesses if they find it is not credible or is disproven by circumstantial evidence. *See City of Keller*, 168 S.W.3d at 827 (in legal sufficiency review we disregard contrary evidence unless reasonable jurors could not). In the end, the test for liability under the Act is an objective one. *Steak & Ale of Tex., Inc. v. Borneman*, 62 S.W.3d 898, 902 (Tex. App.—Fort Worth 2001, no pet.).

In this case, there was direct evidence that Brent's intoxication was manifest and open to view: a video exhibit showed Brent dancing, waving two bottles of alcohol, and drinking directly from them. The police investigating the scene of the accident reported visible signs of intoxication mere minutes after Brent left the club. There was circumstantial evidence as well: his blood alcohol level approximately one hour later was more than twice the legal limit, and expert witness Kerrigan

testified his level would have peaked shortly after his final drink. And expert witness Dr. Mark Willingham opined that appellants allowed Brent "to self-serve himself without appropriate supervision while he was obviously intoxicated to the extent that he was a danger to himself and others."[12]

We conclude—viewing the evidence in the light most favorable to the verdict—that a reasonable fact finder could have concluded that appellants served alcohol to Brent, or allowed him to serve himself, in violation of the standard imposed by the Act. Thus, the evidence was legally sufficient to support the trial court's denial of appellants' motion for instructed verdict. We overrule appellants' first issue.

## Factual Sufficiency of the Evidence

In their second issue, appellants contend the jury's finding that appellants violated the Act is not supported by factually sufficient evidence.[13] In considering a challenge to the factual sufficiency of the evidence, we review the entire record and may set aside the verdict only if it is against the great weight and preponderance of the evidence. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.

---

[12] Willingham's opinions are addressed in more detail below.

[13] We note that in the initial sentence of their discussion, appellants assert that the evidence was insufficient to show that they were "the sole proximate cause of Brown's death." That is not the causation standard under the Act. Instead, the Act requires Brent's intoxication to have been the proximate cause of Brown's death. *See* ALCO. § 2.02(b)(2). Other than this misstatement of the causation standard, appellants do not challenge the trial court's or the jury's conclusions—implicit in both the denial of the motion for instructed verdict and the jury's verdict—that Brent's intoxication was a proximate cause of Brown's death.

2003). A finding is against the great weight and preponderance of the evidence if it is clearly wrong, manifestly unjust, or "shocks the conscience." *Id.*

Appellants rely on the assertions of witnesses who contend they saw no signs that Brent was intoxicated at Beamers: both servers, the doorman, Brent's friend Matsuda, and a number of his teammates who were interviewed in the investigation following Brown's death. We consider this evidence in our analysis. We are not limited, however, to evidence that is contrary to the verdict: we look to the entire record to determine whether that verdict is clearly wrong or manifestly unjust. *See Jackson*, 116 S.W.3d at 761. Our review of that record identifies the following evidence in addition to that addressed under our legal sufficiency discussion:

- Khan testified that she served Brent one glass of champagne. She spoke to him again when he paid for the champagne, and she did not observe any sign that he was intoxicated. But she acknowledged that she did not know how many drinks he had while he was there or what his condition was when he left the club. She also acknowledged that at Brent's criminal trial she watched video from the morning of the accident, and she confirmed that the video showed Brent drinking out of a bottle, holding two bottles up while everyone was cheering and dancing, and holding the bottles in the air and shaking them.

- Fembres testified that she poured one Hennessey and Coke for Brent and that she went back shortly before he left to see if he needed anything else. She did

not observe any signs that he was intoxicated at either point in time. She did not know whether Brent served drinks for himself.

- Black testified that he interacted with Brent when Brent was leaving. Black watched him walk down several flights of stairs without difficulty. The men shook hands and spoke "very, very briefly," and Black watch Brent walk to his car. Black testified that he did not observe any signs that Brent was intoxicated.

- Matsuda testified that she never saw Brent show signs of intoxication that morning, but she also testified that she never saw Brent with a drink the entire time she was sitting with him. And she testified further that she had been with Brent a number of times when he had become intoxicated, and his demeanor did not significantly change.

- The police interviewed six of Brent's teammates who were at Beamers the morning of the accident. Three stated that they were not in Brent's section and they offered no information about what he drank or how he appeared. A fourth stated that he did not know what Brent had to drink, but he did not appear intoxicated. And the final two stated that (a) they had each ordered a bottle of vodka, and (b) Brent did not appear to be intoxicated to them. Two of the six reported seeing two bottles of vodka on Brent's table, but Brent did not remember whether he drank any vodka at Beamers.

- Video taken outside Beamers indicates that Brent was able to drive out of the parking lot without incident. But video evidence also showed Brent dancing with two bottles held in the air, shaking the bottles, and drinking straight from them.

At the time the servers and doorman gave their initial statements, which corresponded on the question of visible intoxication with their testimony at trial, they were employees of the club. And Brent himself testified that his teammates "had his back" in the aftermath of the accident and Brown's death. Despite these witnesses' statements that they saw no signs that Brent was intoxicated, jurors could have reasonably concluded that their statements were subject to personal interest and were not credible. *See City of Keller*, 168 S.W.3d at 819 (jurors are sole judge of credibility of witnesses). Jurors could have determined that Brent's intoxication, as seen on the club's video, was apparent to anyone present and watching. *See Canody*, 995 S.W.2d at 207 (jurors can infer what was "apparent" by weighing evidence, assessing credibility of witnesses, and drawing reasonable inferences from evidence). Because this Court is not a fact finder, we may not pass upon the witnesses' credibility or simply substitute our judgment for that of the jury. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex.1986). When we view all the evidence in a neutral light, we cannot say that the jury's finding shocks the conscience.

We conclude that the jury's finding that appellants provided alcohol to Brent, or allowed him to serve himself, when it was apparent that he was obviously

–14–

intoxicated to the extent that he presented a danger to himself and others was not against the great weight and preponderance of the evidence. The evidence was factually sufficient to support the jury's finding that appellants violated the Act. We overrule appellants' second issue.

## DENIAL OF APPELLANTS' MOTION TO STRIKE EXPERT

In their third issue, appellants challenge the trial court's denial of their motion to strike the opinions of Jackson's expert witness, Dr. Mark Willingham. Willingham is a retired State Law Enforcement Major from the State of Florida's Division of Alcoholic Beverages and Tobacco. His opinions first appeared in the case in the form of an affidavit, offered in response to appellants' motion for summary judgment on dram shop liability. Appellants objected to the affidavit in their summary judgment reply and moved to strike the eight paragraphs of the affidavit that summarized his opinions. The trial court denied that motion. Appellants renewed their objections to Willingham's qualifications and to the reliability of his opinions before he testified. The trial court again overruled those objections.

> Willingham summarized his opinions at the beginning of his testimony:

> When you boil all of my opinions down, and I don't have a copy of them in front me but the bottom line to me is that Beamers did serve Mr. Brent alcoholic beverages or by extension allowed him to self-serve himself without appropriate supervision while he was obviously intoxicated to the extent that he was a danger to himself and others.

Although Willingham developed other opinions, concerning matters such as Beamers' policies related to alcohol service, this summary represents the gist of the opinions challenged by appellants.[14]

> The admissibility of expert testimony is governed by rule 702:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

TEX. R. EVID. 702. The trial court is the "evidentiary gatekeeper" responsible for excluding irrelevant and unreliable expert evidence. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). It has broad discretion to determine the admissibility of evidence, and we will reverse only for an abuse of that discretion. *Id.*

Appellants object first to the reliability of Willingham's opinions, arguing that Jackson failed to show how Willingham's testimony met the requirements for reliability set forth in *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex. 1995). "All expert testimony should be shown to be reliable before it is

---

[14] Appellants make the conclusory statement that Willingham "opined about management, supervision, atmosphere and business of [appellants]. . . . Such opinion was completely inadmissible under TABC 2.02, 2.03 and *Steak and Ale*, 62 S.W.3d 898" (record reference omitted). Both sides of the litigation offered extensive evidence concerning Beamers's policies, training, and business practices. Any complaint concerning admissibility of this evidence was waived by appellants' sponsoring of such evidence themselves and by their failure to offer legal analysis to support their conclusion on appeal. Similarly, appellants' single-sentence assertion that Willingham was not qualified to testify concerning causation because he was not trained in accident reconstruction was neither raised at trial nor briefed adequately in this Court.

admitted." *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). However, *Robinson*'s analysis—on its face—is limited to scientific expert evidence and the methodology necessary to establish that scientific evidence is reliable. 923 S.W.2d at 557 ("[T]he underlying scientific technique or principle must be reliable. Scientific evidence which is not grounded 'in the methods and procedures of science' is no more than 'subjective belief or unsupported speculation.'") (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)).

Jackson argues that Willingham's evidence is rooted in his training and experience, as rule 702 allows, rather than in scientific methodology. Accordingly, the reliability of his opinions are properly tested under a standard different from *Robinson*'s. We agree. Experience alone can provide a sufficient basis for an expert's testimony in some cases. *Gammill*, 972 S.W.2d at 726. But to be certain that an expert qualified by experience is offering reliable opinions, we ask whether there is too great an analytical gap between his data and the opinions he proffers. *Id.* at 727. An analytical gap exists if an expert fails to demonstrate how his observations support his conclusions. *Id.* In applying this reliability standard, the trial court does not decide whether the expert's conclusions are correct; instead, the trial court determines whether the analysis used to reach those conclusions is reliable. *Id.* at 728.

As to his "data," Willingham's report identifies what he reviewed before trial to come to his opinions. The list includes Texas alcoholic beverage laws and Texas Alcoholic Beverage Commission Rules; documents related to the Irving Police Department's and the TABC's investigations; deposition transcripts or affidavits, including those from witnesses Huckaby, Fembres, Kahn, and Black; documentary evidence including the 911 transcript, crash photos, and drink receipts; and information related to appellants' formation, policies, and training guidelines. When Willingham testified at trial, he had also observed the trial testimony of Officers Palms and Huckaby, Kerrigan, Khan, Fembres, Beamers owner Daryush Dario Ferdows, and Brent. He had also seen the various video exhibits that had been played for the jury.[15]

We see no analytical gap between Willingham's data and his conclusion that Brent was obviously intoxicated at Privae. Willingham cited specifics of Brent's behavior at the club that he relied upon in reaching that conclusion:

> his holding up the bottles, acting in a manner that is inconsistent with who [he] is,[16] his holding the bottle and self-pouring and drinking out of the bottle, and as we've talked, his rapid consumption of a large

---

[15] Appellants complain that Willingham's original opinions were based only on still pictures extracted from Beamers video. However, he testified specifically concerning the video exhibits he watched during trial. We see no indication that his dependence on that evidence was inappropriate or unreliable when he testified. Moreover, seeing the video did not change Willingham's opinion that had been based on still pictures; it merely reinforced that opinion.

[16] Undisputed testimony from those who know Brent—including both servers, who coincidentally had spent time with him socially before that morning, and Brent himself—established that he was quiet and reserved by nature.

amount of alcohol. Those are behaviors that even a poorly trained server who was paying attention should have noticed.

Based upon those facts, Willingham testified that Brent's intoxication was "so obvious and open that a properly run business and properly trained managed motivated server should have observed that." He explained that he was also basing his conclusion of obvious intoxication on the fact that Brent had a blood alcohol level of .189 about an hour after leaving, and upon Dr. Kerrigan's testimony that it would have required about eight standard drink units while he was in Beamers to have achieved that BAC level. He stated: "Science informs me, not just the number of bottles laying around on tables."

Willingham acknowledged at trial that his opinion contradicted the testimony of appellants' employees and witness statements given by his Cowboy teammates, but such contradictions go to the weight jurors would give his testimony, not its admissibility. Willingham was subject to vigorous cross-examination; jurors were shown the weaknesses that appellants believed existed within his opinions. Jurors were free to accept or reject his opinions in part or entirely. But when Willingham testified at trial, the data that he relied upon included the majority of the documents and testimony that make up our record. We cannot say that his data was unreliable or that it could not support his conclusion.

Appellants also contend that Willingham was unqualified to give the opinions he proffered. They object first that he was not trained as a toxicologist. But

Willingham was not designated as a toxicologist or offered to give opinions on toxicology. Instead, Jackson identified Willingham as a testifying expert for trial

> on the following three subjects: (1) the behavior that a reasonable server would have observed on the night of the incident given Joshua Brent's level of intoxication, and the amount of alcohol he consumed during his short time at Beamers; (2) Beamers policies and procedures, and how Beamers' failure to follow such policies and procedures caused Beamers to over-serve Joshua Brent; and (3) causation.

Jackson designated Dr. Kerrigan to give expert opinions on toxicology. And Willingham relied upon her opinions as data supporting his own conclusions.[17] Appellants did not challenge Kerrigan's opinions or qualifications in the trial court, and they have not done so here. We reject their challenge to Willingham's qualifications in a field on which he was never designated to testify.

Appellants also argue that Willingham was not qualified to testify at trial because his "sole relevant experience" was earned in Florida, and Florida law concerning civil liability for serving alcoholic beverages differs from Texas law. Willingham's training and experience are in the field of alcohol regulation. He holds a bachelor's degree in criminology, a master's degree in public and business administration, and a Ph.D. in business and corporate security, with a focus on responsible alcohol retailing practices. He worked for 25 years in Florida's alcohol regulatory agency where, he testified, he addressed a significant number of issues

---

[17] In response to challenges to his lack of training in chemistry or toxicology, Willingham testified that "the opinions that I've published in this case do not have any findings on toxicology. I referred to Dr. Kerrigan solely in that regard."

–20–

related to the operation of an alcoholic beverage establishment. He attended the FBI National Academy and earned a fellowship to study liquor-law enforcement and responsibility in the United Kingdom. He testified that he is active in a number of national associations dealing with the regulation of alcohol, including the National Liquor Law Enforcement Association, the National Conference of the Alcoholic Beverage Administrators, and the National Alcoholic Beverage Control Association. We conclude that, contrary to appellants' contentions, Willingham's experience ranges well beyond Florida and its laws. Specifically, Willingham's testimony made clear that he was familiar with the Texas Act and its standards.

We conclude that Willingham is trained in his field and that his opinions were informed by extensive experience in the field of alcohol regulation. The trial court could have concluded that his opinions would be helpful to jurors as they applied the Act's standards to the evidence before them. We discern no abuse of discretion in the court's admission of Willingham's testimony. We overrule appellants' third issue.

## SUFFICIENCY OF EVIDENCE SUPPORTING ESTATE DAMAGES

In their fourth issue, appellants contend that the trial court erred in submitting a jury question allowing damages to be awarded to Brown's estate.[18] The trial court must submit questions that are raised by the pleadings and the evidence. TEX. R. CIV.

---

[18] Appellants preserved this issue in their Motion for New Trial. *See Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex. 1991) (no-evidence point may be preserved by motion for new trial).

P. 278. A trial court may refuse to submit a question only if there is no evidence in the record to warrant its submission. *Park N. Serv. Ctr., L.P. v. Applied Circuit Tech., Inc.*, 338 S.W.3d 719, 721 (Tex. App.—Dallas 2011, no pet.); *see also Cunningham v. Haroona*, 382 S.W.3d 492, 506 (Tex. App.—Fort Worth 2012, pet. denied) (trial court is obligated to submit question on controlling issue if evidence supporting submission amounts to more than scintilla).[19]

Question Number 5 in the charge asked: "What sum of money would have fairly and reasonably compensated Jerry Brown, Jr. for his pain and mental anguish?" The question included the following definition:

> "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by Jerry Brown, Jr. before his death as a result of the occurrence in question.

Appellants contend that no evidence supported submission of this question, arguing that the evidence is "undisputed" that Brown was rendered unconscious at the point of impact, that he never regained consciousness, and that he died at the scene. We disagree.

---

[19] We agree with appellants that this standard parallels the standard for legally insufficient evidence. However, we do not address appellants' argument concerning factually insufficient evidence to submit the question. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983) ("The factual insufficiency of the evidence to support an affirmative answer to an opponent's issue furnishes no basis for refusal to submit the issue." (quoting *Clarostat Mfg. Inc. v. Alcor*, 544 S.W.2d 788, 791 (Tex. Civ. App.—San Antonio 1976, writ ref'd n.r.e.)). The trial court may refuse to submit a relevant question only if no evidence supports it. *Id.*

Texas law allows compensation for pain that is consciously suffered and experienced. *Ruiz v. Guerra*, 293 S.W.3d 706, 722 (Tex. App.—San Antonio 2009, no pet.). The existence of conscious pain may be established by circumstantial evidence or inferred or presumed as a consequence of severe injuries. *Id.* Direct proof of suffering is not necessary, but damages are not permitted for any period of time the injured person is unconscious. *Casas v. Paradez*, 267 S.W.3d 170, 185 (Tex. App.—San Antonio 2008, pet. denied).

Officer Palms testified that when he arrived at the scene of the accident he checked Brown's pulse and determined "there was barely a pulse there." He stated that, based on his experience, he knew that Brown "was already gone for the most part." However he testified that Brown was still alive when he was taken to the hospital. Officer Huckaby confirmed that emergency personnel were performing CPR on Brown as he was being taken from the scene. And Brown's autopsy report states that he did not die until 2:57 a.m. We know, thus, that Brown survived the accident for a period of time.

Our inquiry, then, is whether the record contains more than a scintilla of evidence that Brown was conscious during some portion of that time that he survived. Palms's testimony was conflicting concerning Brown's consciousness: he agreed at one point that Brown was conscious when he arrived on the scene, but he later agreed that Brown never "regained" consciousness. However, the police took statements from witnesses who came upon the accident before police arrived. Two

–23–

of those statements provide evidence that, when viewed in the light most favorable to the verdict, indicate Brown was conscious and suffering after the accident.

Pam Johnson told Palms that "she could swear she heard someone moaning from inside the car." Appellants contend, and we agree, that moaning—standing alone—can be insufficient to prove pain and suffering, especially when it is undisputed that a decedent was unconscious at the time. *See Carlisle v. Duncan*, 461 S.W.2d 254, 256 (Tex. Civ. App.—Dallas 1970, no writ).

In this case, however, a second witness, Stacie McWilliams, reported hearing significantly more than moaning. When McWilliams came upon the accident, she left her vehicle and approached Brent.[20] After he assured her that he was not injured, she spoke to a woman (presumably Johnson) who reported that she had already called 911 and that help was on the way. McWilliams reported that Johnson then returned to her vehicle, but McWilliams remained standing in the roadway, "several feet back" of the burning car, waiting for emergency personnel. She told police:

> Then I heard a man begin to yell, "Help me!" in a hoarse and gravely [sic] voice. My heart started to race and I literally jumped backwards as I screamed a question at [Brent]. I screamed at him if there was someone in the car and he said "Yes!" Again the man in the car whaled [sic], "Help!" At this point I lost my composure and commanded [Brent] to pull the man out of the burning car. He responded to my command by advising that "He (the occupant) won't get out!" I yelled again for him to pull the occupant out to which he responded again by saying "He won't get out!" At this point I started BEGGING and PLEADING with him to PLEASE pull him out! We can't just stand[]

---

[20] The record indicates that McWilliams did not know who Brent was; she referred to him in her statement as "the man in the black slacks."

> here and watch this man die! [Brent] still did not move. I took a few steps towards the burning vehicle myself but the heat and flames were too much! At this point I was convinced [Brent] was not going to move so I turned and I ran back to my vehicle to get my cell phone to call 911 again and to advise there was an occupant in what we previously thought was an empty vehicle.

Jurors reading this statement could reasonably have found that Brown was conscious and suffering as he cried out for help in the burning car. Johnson believed that she heard moaning from the car initially; McWilliams remained close to the burning vehicle and heard Brown "wailing." These statements are evidence that Brown was both conscious and suffering after the accident.

In addition, the record indicates that the actual accident itself was likely the source of mental anguish in this case. Consciousness of approaching death is a proper element to be considered in evaluating mental suffering. *Ruiz*, 293 S.W.3d at 723. And this consciousness may be established by circumstantial evidence. *Union Pac. R. Co. v. Legg*, No. 03-07-00512-CV, 2009 WL 2476636, at *3 (Tex. App.—Austin Aug. 12, 2009, no pet.) (mem. op.). Brent's vehicle was traveling at more than 100 miles per hour when he lost control. It rolled over multiple times, came to rest on the roof of the car, and caught fire. The jury could reasonably have inferred that Brown experienced this extended and violent accident with anticipation of horrible injury or death.

We conclude that appellees presented more than a scintilla of evidence that Brown suffered conscious pain and mental anguish during and after the accident.

The trial court did not err in submitting Question Number 5 to the jury. We overrule appellants' fourth issue.

In their fifth issue, appellants contend that the jury's award of $10 million to Brown's estate was against the great weight and preponderance of the evidence. The standard of review for an excessive damages complaint is factual sufficiency of the evidence. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986) (per curiam).[21]

Appellants cite authority for the propositions that jurors "cannot simply pick a number and put it in the blank." *See Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 552 (Tex. App.—Fort Worth 2006, pet. abated) (citing *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996)). And they quote portions of the supreme court's discussion in *Saenz*, which emphasized that a jury's award for mental anguish damages must be fair and reasonable. *See* 975 S.W.2d at 614. However, appellants offer no reasoned analysis of why the jury's award in this case is not fair and reasonable. Instead, they merely reiterate their position that Jackson did not meet her burden to produce *any* evidence suggesting that Brown was conscious after the accident. The only inference we can draw from this position is that appellants contend there should have been *no* monetary award for pain and mental anguish.

---

[21] We understand this issue to challenge only the amount of the damages award. Appellants argue consistently throughout these two issues that there was *no* evidence of conscious pain and suffering. They present no factual-sufficiency argument concerning the existence of conscious pain and suffering.

–26–

We have concluded, however, that the trial court properly submitted this question to the jury because the record contains more than a scintilla of evidence supporting the fact that Brown suffered conscious pain and mental anguish. Accordingly, some evidence supported the jury's implicit conclusion that Brown suffered pain and mental anguish, and, therefore, some monetary award was appropriate. The jury has wide latitude in determining the amount of an award for pain and suffering. *Burry*, 203 S.W.3d at 552. "Matters of pain and suffering, which are necessarily speculative and not subject to precise mathematical calculations, are particularly within the province of the jury to resolve and to determine appropriate amounts." *SW Tex. Coors, Inc. v. Morales*, 948 S.W.2d 948, 951 (Tex. App.—San Antonio 1997, no writ).

In the end, we can set aside the jury's verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). We have concluded the evidence was sufficient for a jury to infer that Brown suffered mental anguish during the course of the accident and both physical pain and anguish while he was trapped in the burning vehicle. Appellants have given us no substantive rationale to reject the jury's evaluation of that pain and anguish. We overrule their fifth issue.

## PREJUDGMENT INTEREST

Appellant's sixth issue asks whether the trial court abused its discretion in awarding prejudgment interest on future elements of damages. However, their argument under that heading is limited to a different matter: whether prejudgment interest properly accrued during the period in which appellants were in bankruptcy. Appellants rely on section 304.108 of the Texas Finance Code, which—they contend—allows the trial court to toll accrual of prejudgment interest after considering whether any delay or attempt to avoid liability was due to the fault of the party. Their bankruptcy, appellants argue, was not an intentional attempt to avoid liability.

However, section 304.108 was repealed by the legislature in 2003, and it cannot support any argument to toll prejudgment interest. *Pilgrim's Pride Corp. v. Burnett*, No. 12-10-00037-CV, 2012 WL 381714, at *15 (Tex. App.—Tyler Feb. 3, 2012, no pet.) (mem. op.) ("To hold that the court would retain equitable power to toll prejudgment interest for delays in the trial by the conduct of the plaintiff in spite of the repeal of the statute authorizing such relief would be in contravention to the repeal of Section 304.108."). We find no existing authority supporting such a tolling of prejudgment interest. *See Siam v. Mountain Vista Builders*, 544 S.W.3d 504, 513 (Tex. App.—El Paso 2018, no pet.) (trial court may not reduce or eliminate plaintiff's prejudgment interest award because of delays caused by either party in resolving case); *see also Matthews v. DeSoto*, 721 S.W.2d 286, 287 (Tex. 1986)

("We disapprove the court of appeals language that a trial court has the discretion to reduce a plaintiff's prejudgment interest award.").

We overrule appellants' sixth issue.

## CONCLUSION

We affirm the trial court's judgment.

/Bill Pedersen, III/
BILL PEDERSEN, III
JUSTICE

190698f.p05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

BEAMERS PRIVATE CLUB D/B/A
PRIVATE LOUNGE; BAVARIAN
MANAGEMENT, LLC, Appellants

No. 05-19-00698-CV     V.

STACEY M. JACKSON,
INDIVIDUALLY AND AS
PERSONAL REPRESENTATIVE
OF THE ESTATE OF JERRY
BROWN, JR., Appellee

On Appeal from the 191st Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-13-13245.
Opinion delivered by Justice
Pedersen, III. Justices Osborne and
Garcia participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee STACEY M. JACKSON, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JERRY BROWN, JR. recover her costs of this appeal from appellants BEAMERS PRIVATE CLUB D/B/A PRIVATE LOUNGE; BAVARIAN MANAGEMENT, LLC.

Judgment entered this 20th day of April, 2021.